STATE OF CONNECTICUT *v.* ROBERT MERRIAM
(SC 16715)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

618

620

Argued September 23, 2002—officially released July 15, 2003

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant).

*Melissa L. Streeto*, special deputy assistant state's attorney, with whom, on the brief, were *Scott Murphy*, state's attorney, and *Louis Luba*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Robert Merriam, guilty of sexual assault in the first degree in violation of General Statutes (Rev. to 1987) § 53a-70 (a),[1] sexual assault in the second degree in violation of General Statutes (Rev. to 1987) § 53a-71 (a) (1),[2] and risk of injury to a child in violation of General Statutes (Rev. to 1987) § 53-21.[3] The trial court rendered judgment in

---

[1] General Statutes (Rev. to 1987) § 53a-70 (a) provides: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

All references in this opinion to § 53a-70 are to the 1987 revision unless otherwise stated.

[2] General Statutes (Rev. to 1987) § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and such other person is (1) under sixteen years of age . . . ."

All references in this opinion to § 53a-71 are to the 1987 revision unless otherwise stated.

[3] General Statutes (Rev. to 1987) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

All references in this opinion to § 53-21 are to the 1987 revision unless otherwise stated.

accordance with the jury verdict,[4] and the defendant appealed,[5] claiming that the trial court improperly had: (1) denied his motion for a judgment of acquittal on the ground of evidentiary insufficiency; (2) permitted the state to introduce into evidence certain hearsay statements in violation of his rights under the confrontation clause of the sixth amendment to the United States constitution; (3) permitted the state to introduce evidence of certain prior misconduct by the defendant; and (4) failed to investigate adequately his allegations of juror misconduct in violation of his federal and state constitutional rights to a fair trial. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In May, 1987, the victim, then a three and one-half year old female, lived in an apartment with her mother, her older sister, her sister's young daughter,[6] and the defendant. The defendant, who was the boyfriend of the victim's mother, had resided in the apartment since January, 1987. The victim, whose biological father had passed away when she was seven months old, called the defendant, "Daddy." Between January, 1987, and May, 1987, no man other than the defendant resided in the apartment.[7] Furthermore, the victim's mother occasionally left the victim home alone with the defendant.

Within a few weeks after the defendant had moved into the apartment, the victim began to behave in a

---

[4] The trial court sentenced the defendant to a total effective term of thirty years imprisonment.

[5] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] The victim's sister was twenty-one years old at the time and her daughter was four years old.

[7] The victim's nineteen year old brother occasionally spent the night at the apartment when he was not at his girlfriend's house.

manner that was troubling and unfamiliar to those around her. In particular, within a few weeks after the defendant began living with the victim and her mother, the victim started to exhibit sexual behavior inappropriate for a child her age. The victim's mother noticed that the victim often placed her hands down her pants. When the victim's mother bathed the victim, the victim would "gyrate" while in the bathtub. The victim's sister also noticed that the victim repeatedly touched her genital area. On more than one occasion, the victim's sister observed the victim lying face down on her bed making "up and down" motions with her body. Both the victim's mother and sister noticed that, during this time, the victim's vaginal area was irritated, red and swollen. They also noticed that the victim was very withdrawn, quiet and nervous. Although the victim had been toilet trained before the defendant began living in the apartment, she thereafter began urinating in her bed at night. The victim had begun to suck her thumb so frequently that her thumbnail eventually fell off. Neither the victim's mother nor the victim's sister ever had seen the victim act in this manner before.

Employees at the day care center that the victim attended also began to notice that the victim had been behaving strangely. They observed that the victim was extremely withdrawn and often had her hand in her pants. When employees at the day care center would rub the victim's stomach or back to help her relax during nap time, the victim would become "very sensually aroused." In addition, the victim cried after urinating.

On or about May 12, 1987, Ida Yelding, a social worker employed by the day care center, noticed that the victim had her hands in her pants while she was moving her hips in an unusual manner. In Yelding's view, it was as if the victim was approaching some sort of sexual climax. Yelding, who had worked at the day care center for more than thirteen years, never before had witnessed

conduct of this kind by a child. Concerned about the victim's behavior, Yelding approached the victim and asked her what was wrong. The victim responded, "Daddy."

Yelding immediately reported this incident to Carolyn Miranda, the director of child care programs at the day care center. Miranda thereupon went to the victim's classroom, where she observed that the victim was visibly upset. After speaking with Yelding and the victim, Miranda, who, in light of the circumstances, suspected that the victim had been sexually abused, filed a report that same day with the state department of children and youth services (department), what is now the department of children and families. In that report, Miranda revealed, inter alia, that the victim had stated to the teacher that " 'Daddy' touched her." Miranda subsequently contacted the victim's mother.

Thereafter, the victim's mother asked the victim what was wrong. The victim responded that "Daddy" had "hurt her." The victim further indicated that the incident had occurred some time during the first two weeks of May, 1987. When the victim's mother confronted the defendant with this information, he denied that he ever had sexually abused the victim. Nevertheless, the victim's mother told the defendant that she intended to notify the police, and, soon thereafter, the defendant, without explanation, vacated the apartment and left the state.

On or about May 21, 1987, the victim's mother brought the victim to William Currao, a pediatrician. Currao performed a physical examination of the victim, including an examination of her genital area. That examination revealed various injuries uncommon for a girl of the victim's age, all of which were consistent with digital or penile penetration of the victim's vagina. In particu-

lar, Currao found that the victim's labia majora[8] were red and irritated and that her hymen had been torn.

On May 27, 1987, the victim and her mother met with Detective Lawrence Betterini of the New Britain police department. During an interview at the police station, the victim revealed to Betterini that the defendant had touched her vagina with his penis.

Betterini attempted to contact the defendant to speak with him about the allegations of sexual abuse. In particular, Betterini spoke with several of the defendant's family members and tried to contact the defendant at various addresses but was unable to locate him. On June 4, 1987, Betterini obtained an arrest warrant for the defendant. Continued efforts by the police to locate the defendant were unsuccessful. The defendant finally was apprehended by state police in Vermont on September 13, 1997, and, thereafter, was extradited to this state. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly denied his motion for a judgment of acquittal on the ground that the evidence adduced at trial was insufficient to support his convictions for sexual assault in the first degree, sexual assault in the second degree and risk of injury to a child. The defendant's sole claim of evidentiary insufficiency rests on his contention that the state failed to establish that the defendant had engaged in sexual intercourse with the victim. Specifically, the defendant contends that the state's evidence was inadequate to establish sexual intercourse[9] because

[8] The labia majora are folds of skin that form part of the boundaries of the opening of the vagina and constitute part of the external genitalia in females. Gray's Anatomy (38th Ed. 1995) p. 1876; see *State* v. *Albert*, 252 Conn. 795, 809 n.17, 750 A.2d 1037 (2000).

[9] General Statutes (Rev. to 1987) § 53a-65 (2) defines the term "sexual intercourse" in relevant part as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or

the state did not prove the element of penetration. We disagree.[10]

In support of its charge that the defendant had sexually assaulted the victim, the state adduced the testimony of several witnesses,[11] including Miranda, the day care center supervisor. Miranda testified that, as a day care center supervisor, she was statutorily obligated to report to the department all suspected cases of sexual abuse. See General Statutes (Rev. to 1987) § 17-38a.[12]

---

fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body. . . ."

All references in this opinion to § 53a-65 (2) are to the 1987 revision unless otherwise stated.

[10] Although sexual intercourse is not an element of the offense of risk of injury to a child; General Statutes (Rev. to 1987) § 53-21; see footnote 3 of this opinion; the defendant contends that the state's alleged failure to prove that the defendant engaged in sexual intercourse with the victim entitles him to a judgment of acquittal on that charge as well as the two sexual assault charges. This claim is fundamentally flawed in light of the fact that evidence establishing sexual intercourse with a child is *not* a prerequisite to a conviction under § 53-21. Indeed, as a general matter, many forms of sexual misconduct involving a child short of sexual intercourse may satisfy the elements of § 53-21. See, e.g., *State* v. *Zwirn*, 210 Conn. 582, 589–90, 556 A.2d 588 (1989). Because we conclude, however, that the evidence was sufficient to establish beyond a reasonable doubt that the defendant did engage in sexual intercourse with the victim, the state's evidence necessarily was sufficient to satisfy the elements of § 53-21.

[11] The victim, who was sixteen years old at the time of trial, testified in the presence of the jury that she had no specific recollection of the period from January, 1987, through May, 1987, and that she also had no memory of being sexually abused as a young child. She also testified, however, that she sometimes had "flashbacks" in which she saw herself kicking and punching an unidentified man while screaming "no" and trying to climb out of a window.

[12] General Statutes (Rev. to 1987) § 17-38a provides in relevant part: "(a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.

Miranda testified that, in light of the victim's overtly sexual behavior and the victim's statements to Yelding and Miranda connecting "Daddy" to that conduct, Miranda submitted a written report to the department. That report, which was introduced as a full exhibit at trial, provided in relevant part: "Child has hands in pants more often than not . . . says its hurts and has cried after urination. When asked what was wrong when crying, she told [t]eacher 'Daddy' touched her. . . . [Yelding] also talked to child about touching incident [and] child began to shake while talking to her."

The state also presented the testimony of Detective Betterini, who had interviewed the victim during his investigation of the defendant's alleged sexual abuse. According to Betterini, the victim told him that "Daddy touched her buggy" and that "Daddy touched [her] with his buggy . . . ." Betterini further testified that the victim's mother stated to him that the victim had told her that "[D]addy hurt me" and that "Daddy put his buggy into my buggy."

In addition, Betterini presented the victim with anatomically correct drawings of a preschool age female

"(b) Any physician or surgeon registered under the provisions of chapter 370 or 371, any resident physician or intern in any hospital in this state, whether or not so registered, and any registered nurse, licensed practical nurse, medical examiner, dentist, psychologist, school teacher, school principal, school guidance counselor, social worker, police officer, clergyman, osteopath, optometrist, chiropractor, podiatrist, mental health professional or any person paid for caring for children in a day care center who has reasonable cause to suspect or believe that any child under the age of eighteen . . . is in a condition which is the result of maltreatment such as, but not limited to . . . sexual abuse . . . shall report or cause a report to be made in accordance with the provisions of subsection (c) [of this section]. . . .

"(c) An oral report shall be made immediately . . . to the state commissioner of children and youth services or his representative, or the local police department or the state police to be followed within seventy-two hours by a written report to the commissioner . . . or his representative. . . ."

General Statutes (Rev. to 1987) § 17-38a is now codified, as amended, at General Statutes § 17a-101.

and an adult male, and asked her to identify various body parts on the drawings, such as the eyes, nose and mouth. After the victim successfully had identified those body parts, Betterini asked her to circle the areas on the drawings to which she was referring when she used the term "buggy." On the drawing of the female child, the victim circled the vagina. On the drawing of the adult male, the victim circled the penis.[13] Betterini further testified that, although the victim did not specifically identify the defendant as "Daddy," she did state that "Daddy" was the person who was living with her mother. Moreover, both the victim's mother and sister testified that, at the time, the victim referred to the defendant as "Daddy."

The state also presented the testimony of Currao, the victim's pediatrician. After being qualified as an expert in pediatrics, Currao testified that his examination of the victim in May, 1987, had revealed redness and irritation of the victim's labia majora, the external portion of the female genitals. See footnote 8 of this opinion. Currao's internal examination of the victim also revealed a tear in her hymen. According to Currao, this type of injury is uncommon for a girl of the victim's age and indicates penetration of an invasive nature. Currao also testified that the victim's injury was consistent with digital or penile penetration and opined that "there was a good chance of there being sexual abuse." With the foregoing evidentiary background in mind, we turn next to the legal principles governing our review of the defendant's claim of evidentiary insufficiency.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict.

---

[13] Betterini's testimony regarding the victim's use of the term "buggy" was corroborated by the victim's own trial testimony that, as a young child, she had used that term to refer to her genital area.

Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Murphy*, 254 Conn. 561, 575–76, 757 A.2d 1125 (2000). "Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) Id., 576.

As we have indicated, the defendant's claim of evidentiary insufficiency is predicated on his assertion that the state failed to prove penetration and, consequently, failed to prove that the defendant engaged in vaginal sexual intercourse with the victim. It is true, as the defendant contends, that, in the absence of penetration, vaginal sexual intercourse cannot have occurred for purposes of our Penal Code. See General Statutes (Rev. to 1987) § 53a-65 (2);[14] see also *State* v. *Scott*, 256 Conn. 517, 532–33, 535 & n.25, 779 A.2d 702 (2001); *State* v. *Albert*, 252 Conn. 795, 803–806, 750 A.2d 1037 (2000). Nevertheless, because the statutory provisions that prohibit forcible and nonconsensual sexual intercourse were designed to "punish the fact, not the degree, of penetration"; (internal quotation marks omitted) *State* v. *Albert*, supra, 805; the "least penetration of the body" is sufficient to satisfy the penetration element of this state's sexual assault statutes. Id. Accordingly, we recently have concluded that the penetration element of those statutes is satisfied by the penetration of the labia majora because penetration of the labia majora constitutes penetration of the body. Id., 805–806, 809.

Contrary to the defendant's claim, the evidence was sufficient to satisfy the penetration element of §§ 53a-70 (a) and 53a-71 (a), the sexual assault statutes under which the defendant had been charged. The jury heard testimony that: (1) in May, 1987, the victim was behaving strangely and in a manner suggestive of sexual abuse; (2) the victim repeatedly complained that "Daddy touched her buggy," "used [his] buggy to touch her," "put his buggy into [her] buggy" and "hurt" her;[15] (3)

---

[14] See footnote 9 of this opinion.

[15] We note that, among his other claims, the defendant has challenged the admissibility of certain testimony of Betterini, which, for reasons we hereinafter explain; see part II of this opinion; improperly, albeit harmlessly, was admitted into evidence. We also note, however, that the defendant makes no claim that, on appeal, this court is barred from considering that evidence in resolving his evidentiary insufficiency claim. See *State* v. *Carey*, 228 Conn. 487, 493–94, 636 A.2d 840 (1994) (in reviewing evidentiary insuffi-

the victim used the term "buggy" to refer to genitalia; and (4) the victim referred to the defendant as "Daddy." The evidence also established that the victim's labia majora were red and irritated, and that her hymen had been torn, which, according to expert testimony, likely was the result of digital or penile penetration and indicative of sexual abuse. Based on the foregoing evidence, we conclude that the state satisfied its burden of establishing beyond a reasonable doubt that the defendant had engaged in sexual intercourse with the victim as that term is defined in § 53a-65 (2). Consequently, the defendant's claim of evidentiary insufficiency fails.

## II

The defendant next contends that the admission of certain hearsay evidence under the residual exception to the hearsay rule violated his sixth amendment[16] right to confront his accusers.[17] Specifically, the defendant challenges the admissibility of testimony: (1) of three witnesses regarding statements made to them by the victim; and (2) of one of those witnesses regarding statements made to him by the victim's mother. We conclude that the admission of the hearsay evidence consisting of the victim's statements did not violate the

ciency claim, appellate tribunal considers all evidence heard by fact finder, including any evidence that appellate tribunal ultimately determines improperly was admitted); *State* v. *Gray*, 200 Conn. 523, 538–40, 512 A.2d 217, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986) (same).

[16] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." The sixth amendment right of confrontation is made applicable to the states through the due process clause of the fourteenth amendment. See *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[17] The defendant also contends that the admission of this evidence violated his right of confrontation under article first, § 8, of the state constitution. The defendant, however, has provided no independent state constitutional analysis for this claim. In the absence of such analysis, we limit our review to the defendant's federal constitutional claim. E.g., *State* v. *Robertson*, 254 Conn. 739, 743 n.5, 760 A.2d 82 (2000).

defendant's sixth amendment right to confrontation. Although we conclude that the trial court improperly permitted the state's attorney to introduce the hearsay statements of the victim's mother, we also conclude that the admission of those statements was harmless beyond a reasonable doubt. Accordingly, we reject the defendant's claim that the admission of this hearsay evidence entitles him to a new trial.

The following additional facts and procedural history are necessary for our resolution of the defendant's claims. At trial, the victim testified on direct examination that she lacked any specific memory of the period from January, 1987, to May, 1987.[18] On the basis of this testimony, the trial court found[19] that the victim lacked any recollection of that time frame and, therefore, concluded that the victim was unavailable to testify.[20]

The state's attorney thereafter sought to elicit certain testimony from Yelding, the victim's mother and Detective Betterini about certain statements that the victim had made to them in May, 1987. The defendant objected to the testimony of each of the three witnesses regarding the victim's statements on the ground that the victim's statements did not fall within an exception to the hearsay rule. The trial court overruled the defendant's objections and allowed the state's attorney to introduce the victim's statements through the testimony of the witnesses under the residual exception to the hearsay rule. Over the defendant's objection, the court also allowed Betterini to testify about certain statements that the victim's mother had made to him during his investigation of the defendant's sexual abuse of the

---

[18] See footnote 11 of this opinion.

[19] See Conn. Code Evid. § 1-3 (a) ("[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court").

[20] The defendant did not challenge the court's finding regarding the victim's lack of recollection or the court's determination that the victim was unavailable as a witness.

victim. Any additional facts that are necessary to the resolution of each of the defendant's separate challenges to the testimony of Yelding, the victim's mother and Betterini will be provided as necessary.

Before analyzing the merits of the defendant's claims, we first summarize the applicable law. An out-of-court statement offered to establish the truth of the matter asserted is hearsay. E.g., *State* v. *Dehaney*, 261 Conn. 336, 355, 803 A.2d 267 (2002). As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule. E.g., id. A hearsay statement that does not fall within one of the traditional exceptions to the hearsay rule nevertheless may be admissible under the residual exception to the hearsay rule provided that the proponent's use of the statement is reasonably necessary[21] and the statement itself is "supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." Conn. Code Evid. § 8-9;[22] accord *State* v. *Hines*, 243 Conn. 796, 809, 709 A.2d 522 (1998).

Beyond these general evidentiary principles, the state's use of hearsay evidence against an accused in a criminal trial is limited by the confrontation clause of the sixth amendment. In defining the specific limits

[21] Reasonable necessity may be established by showing that "unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or otherwise unavailable, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 809, 709 A.2d 522 (1998); accord Conn. Code Evid. § 8-9, commentary.

[22] Section 8-9 of the Connecticut Code of Evidence provides: "A statement that is not admissible under any of the [hearsay] exceptions [enumerated in the code] is admissible if the court determines that (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule."

of the confrontation clause, the United States Supreme Court consistently has held that the confrontation clause does not erect a per se bar to the admission of hearsay statements against criminal defendants. E.g., *Idaho* v. *Wright*, 497 U.S. 805, 813, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see also id., 814 ("[w]hile a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, [the] Court has rejected that view as unintended and too extreme" [internal quotation marks omitted]). At the same time, "[a]lthough . . . hearsay rules and the Confrontation Clause are generally designed to protect similar values, [the court has] also been careful not to equate the Confrontation Clause's prohibitions with the general rule prohibiting the admission of hearsay statements. . . . The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." (Citations omitted.) *Idaho* v. *Wright*, supra, 814.

For purposes of the confrontation clause, "hearsay statements are admissible if (1) the declarant is unavailable to testify, and (2) the statement bears adequate indicia of reliability. *Ohio* v. *Roberts*, 448 U.S. 56, 66, [100 S. Ct. 2531], 65 L. Ed. 2d 597 (1980) . . . . A statement is presumptively reliable if it falls within a firmly rooted hearsay exception.[23] [Id.] A hearsay exception is firmly rooted if it rest[s] upon such solid foundations that admission of virtually any evidence within [it] comports with the substance of constitutional protection. Id. Evidence admitted under such an exception thus is presumed to be so trustworthy that adversarial testing would add little to its reliability. *Idaho* v. *Wright*, [supra,

---

[23] Such "firmly rooted" hearsay exceptions include, for example, the spontaneous utterance exception, the dying declaration exception and the exception for statements made for the purpose of obtaining medical treatment. See *Idaho* v. *Wright*, supra, 497 U.S. 820.

497 U.S. 821]. Evidence that does not fall within a firmly rooted hearsay exception, however, is inadmissible under the Confrontation Clause absent a showing of particularized guarantees of trustworthiness. *Ohio* v. *Roberts*, [supra, 66]." (Internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 158–59, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

The issue presented, therefore, is whether the challenged evidence bears sufficient particularized guarantees of trustworthiness such that its admission comports with the sixth amendment. Our resolution of that issue is guided by *Idaho* v. *Wright,* supra, 497 U.S. 805, in which the United States Supreme Court addressed the limitations that the confrontation clause places on the admission of evidence under residual exception to the hearsay rule in the context of a prosecution for the sexual abuse of a child. See generally id., 818–26.

In *Wright*, the defendant, Laura Lee Wright, and her codefendant, Robert Giles, were charged with certain crimes in connection with their sexual abuse of two young girls, namely, Wright's five and one-half year old daughter (older victim), and Wright's and Giles' two and one-half year old daughter (younger victim). Id., 808–809. The charges stemmed from the older victim's allegations that Giles had engaged in sexual intercourse with both victims while Wright held them down and covered their mouths. Id., 809.

After determining that the younger victim was unavailable as a witness based on her inability to communicate with the jury, the Idaho District Court (district court) permitted a physician, who was called by the prosecutor, to testify regarding certain statements concerning the alleged abuse that the younger victim had made to him during a medical examination after the

abuse had occurred. See id., 809–11. The physician testi-
fied that he had asked the younger victim, "Does daddy
touch you with his pee-pee?" (Internal quotation marks
omitted.) Id., 810. According to the physician's testi-
mony, the younger victim responded affirmatively. Id.,
811. The physician also asked, "Do you touch his pee-
pee?" (Internal quotation marks omitted.) Id., 810. The
younger victim initially did not respond to this question.
Id., 811. According to the physician, however, the child
subsequently volunteered that, "[d]addy does do this
with me, but he does it a lot more with my sister [the
older victim] than with me." (Internal quotation marks
omitted.) Id. In concluding that the younger victim's
statements were sufficiently trustworthy to justify their
admission under Idaho's residual exception to the hear-
say rule;[24] Idaho R. Evid. 803 (24); the district court
relied on the following factors: (1) there was no evi-
dence to suggest that the younger victim had a motive
to fabricate; (2) the nature of the younger victim's state-
ments suggested that she possessed a knowledge of
sex that was unusual for someone her age; (3) physical
evidence corroborated the younger victim's statements;
(4) the older victim corroborated the younger victim's
identification of the abusers; and (5) Wright had the
opportunity to commit the crime. See *Idaho* v. *Wright*,
supra, 497 U.S. 825–26. Wright ultimately was con-
victed.[25] Id., 812.

Wright appealed but only with respect to her convic-
tion for conduct involving the younger victim. *State* v.
*Wright*, 116 Idaho 382, 383, 775 P.2d 1224 (1989). On
appeal, the Supreme Court of Idaho concluded that, in
light of the fact that the physician's medical examina-

---

[24] Idaho's residual hearsay exception is substantially similar to this state's
residual hearsay exception. Compare Idaho R. Evid. 803 (24) with Conn.
Code Evid. § 8-9.

[25] Giles also was convicted. *Idaho* v. *Wright*, supra, 497 U.S. 812. His case,
however, was not the subject of the United States Supreme Court's decision
in *Wright*.

tion and interview of the younger victim was not recorded on videotape; id., 385; and because the physician had a "preconceived idea of what the [younger victim] should be disclosing" and had used "blatantly leading questions"; id.; the younger victim's statements lacked sufficient indicia of reliability such that their admission into evidence violated the dictates of the confrontation clause. Id. Inasmuch as Idaho's use of the younger victim's statements was not harmless beyond a reasonable doubt, the Idaho Supreme Court reversed in part the judgment of conviction and remanded the case for a new trial. See id., 389. The United States Supreme Court subsequently granted Idaho's petition for a writ of certiorari. *Idaho* v. *Wright*, 493 U.S. 1041, 110 S. Ct. 833, 107 L. Ed. 2d 829 (1990).

In reviewing Idaho's claim that the Idaho Supreme Court improperly had reversed in part the judgment of conviction, the United States Supreme Court noted, first, that the younger victim's statements were not presumptively reliable because the exception to the hearsay rule under which they had been admitted, i.e., the residual exception, is not a firmly rooted hearsay exception for purposes of the confrontation clause.[26] *Idaho* v. *Wright*, supra, 497 U.S. 817. The court explained that "[a]dmission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthi-

[26] The court also noted at the outset of its analysis that, because Wright had not challenged the district court's determination that the younger victim was unavailable as a witness, it was not necessary for the court to decide "whether, before a child's out-of-court statements are admitted, the Confrontation Clause requires the prosecution to show that a child witness is unavailable at trial—and, if so, what that showing requires." *Idaho* v. *Wright*, supra, 497 U.S. 815–16. In the context of the present case, we also need not address that issue in view of the fact that the defendant did not and does not contest on appeal the trial court's determination that the victim was unavailable to testify. See footnote 20 of this opinion.

ness of certain types of out-of-court statements." Id. The court further explained that "[United States Supreme Court] precedents have recognized that statements admitted under a firmly rooted hearsay exception are so trustworthy [in light of the circumstances under which they are made] that adversarial testing would add little to their reliability." (Internal quotation marks omitted.) Id., 820–21. "The residual hearsay exception, by contrast, accommodates ad hoc instances in which statements not otherwise falling within a recognized hearsay exception might nevertheless be sufficiently reliable to be admissible at trial. . . . Hearsay statements admitted under the residual exception, almost by definition, therefore do not share the same tradition of reliability that supports the admissibility of statements under a firmly rooted hearsay exception." (Citations omitted.) Id., 817.

The court then addressed the issue of whether the admission of the younger victim's statements against Wright was not precluded by the confrontation clause because those statements possessed sufficient particularized guarantees of trustworthiness. Id., 818–26. In deciding that issue, the court clarified that a statement "possessing particularized guarantees of trustworthiness must be at least as reliable as evidence admitted under a firmly rooted hearsay exception"; id., 821; and, consequently, a statement "admitted under the former requirement must similarly be so trustworthy [in view of the circumstances under which the statement is made such] that adversarial testing would add little to its reliability." (Citation omitted; internal quotation marks omitted.) Id. The court concluded, therefore, that "the particularized guarantees of trustworthiness required for admission under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." (Internal

quotation marks omitted.) Id., 820. The court made it clear that evidence corroborating the truth of a hearsay statement may not be considered in evaluating the statement's reliability. Id., 822. "To [pass muster] under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." Id. As the court explained, "the use of corroborating evidence to support a hearsay statement's particularized guarantees of trustworthiness would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result [that is] at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility." (Internal quotation marks omitted.) Id., 823.

The court identified a "number of factors [that] . . . properly relate to whether hearsay statements made by a child witness in [a] child sexual abuse [case] are reliable." Id., 821. The list of factors identified by the court included: (1) the degree of spontaneity inherent in the making of the statements; (2) consistent repetition by the declarant; (3) the declarant's mental state; (4) use of terminology not within the average ken of a child of similar age; and (5) the existence of a motive to fabricate or lack thereof. Id., 821–22. The court emphasized that the "unifying principle" underlying the enumerated factors is that they "relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." Id., 822. The court further noted, however, that the list of factors it had identified was not exclusive, that it was not endorsing any particular "mechanical test for determining particularized guarantees of trustworthiness under the [Confrontation] Clause"; (internal quotation marks omitted)

id.; and that "courts have considerable leeway in their consideration of appropriate factors." Id.

Applying these principles, the United States Supreme Court held that the Idaho Supreme Court correctly had concluded that the admission of the child's statements violated Wright's confrontation clause rights. Id., 828. The court first rejected the district court's reliance on corroborative evidence because such evidence was "irrelevant to a showing of the particularized guarantees of trustworthiness necessary for [the] admission of hearsay statements under the Confrontation Clause." (Internal quotation marks omitted.) Id., 826. Although the district court also had relied in part on appropriate factors, namely, that the younger victim had no apparent motive to lie and that the statements demonstrated knowledge that was unusual for a child of her age, the court nevertheless concluded that the suggestive manner in which the physician had conducted the interview so undermined the reliability of the statements that their admission did not satisfy the requirements of the confrontation clause. Id. Although the court "reject[ed] the apparently dispositive weight placed by [the Idaho Supreme] [C]ourt on the lack of procedural safeguards at the interview"; id., 818; the court nevertheless concluded that, in view of the totality of the circumstances, the statements that the younger victim had made to the physician lacked the reliability demanded by the confrontation clause. See id., 826–27. The court, therefore, affirmed the judgment of the Idaho Supreme Court, thereby upholding that court's partial reversal of Wright's conviction. Id., 827. Guided by the principles enunciated in *Wright*, we now turn to the merits of the defendant's claims in the present case.[27]

___

[27] We note, preliminarily, that in *Lilly* v. *Virginia*, 527 U.S. 116, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999), a plurality of the United States Supreme Court instructed that, "when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, [appellate] courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause." Id., 137 (opinion

### A

The defendant first challenges the trial court's ruling allowing Yelding to testify regarding a statement that the victim had made to her. As we noted previously, Yelding testified that she had observed the victim acting in a manner "inappropriate" for a child her age. When the state's attorney asked Yelding to explain what she meant by "inappropriate," Yelding testified that the victim was lying on a cot with "her hands in her pants . . . [and] her tongue out of her mouth, and [that] she was moving her lower part of her body and breathing hard . . . ." According to Yelding, the victim appeared to be attaining "some kind of a sexual climax or something . . . ."

Outside the presence of the jury, the state's attorney indicated that he intended to offer a statement that the victim had made to Yelding. In connection with the offer of proof regarding that statement, Yelding testified that, after witnessing the victim's unusual behavior, she approached the victim and asked her "what was wrong." According to Yelding, the victim responded, "Daddy." The defendant objected to the testimony on the ground that it contained inadmissible hearsay. The state's attorney claimed that the victim's statement was admissible under the residual exception to the hearsay rule.

The trial court then made the following findings: "With respect to [Yelding], the court finds that she is a reliable witness, that the statements that she heard were heard during the course of her employment at the day care center, that the statement, 'Daddy,' was a

of Stevens, J., in which Souter, Ginsberg and Breyer, Js., joined). For purposes of this case, and in accordance with *Lilly*, we conduct an independent review of the circumstances surrounding the victim's statements in determining whether those statements possess the particularized guarantees of trustworthiness that are necessary to satisfy the requirements of the confrontation clause.

spontaneous statement by the three to four year old victim at the time so that there was no indicia of unreliability in that there was no motive for the victim to falsify or lie at the time." On the basis of these findings, the trial court allowed the state's attorney to introduce the victim's statement through Yelding's testimony under the residual hearsay exception. Thereafter, Yelding testified in the presence of the jury that, after observing the victim's unusual behavior, she asked the victim what was wrong, and the victim answered, "Daddy."

The defendant claims that the victim's out-of-court statement lacked particularized guarantees of trustworthiness and, consequently, its admission violated his rights under the confrontation clause. In connection with this claim, the defendant underscores the fact that, contrary to the dictates of *Wright*, the trial court relied on corroborative evidence unrelated to the statement itself, namely, Yelding's credibility. Although we agree with the defendant that the trial court improperly considered Yelding's credibility in evaluating the trustworthiness of the victim's statement, we nevertheless conclude that the statement bore sufficient indicia of reliability to withstand scrutiny under the confrontation clause.

As we have indicated, the trial court's reliance on Yelding's credibility as a witness was irrelevant to a determination of the trustworthiness of the victim's statement itself. Although the jury necessarily was required to evaluate Yelding's credibility in determining whether the victim actually *made* the statement, Yelding's veracity simply has no bearing on the reliability of the *victim's statement to her*. Thus, to the extent that the trial court relied on Yelding's credibility in concluding that the victim's statement possessed particularized guarantees of trustworthiness, that reliance was misplaced.

A review of the circumstances under which the victim made the statement to Yelding nevertheless persuades us that the statement was sufficiently reliable to withstand scrutiny under the confrontation clause. First, the record is devoid of any evidence to suggest that the victim had a motive to fabricate or otherwise falsely implicate the defendant. Nor was the victim's statement self-serving in any way. Indeed, the victim's young age "substantially lessen[s] the degree of skepticism with which we view [her] motives, and mitigates in favor of the trustworthiness and admissibility of her declarations." (Internal quotation marks omitted.) *United States* v. *NB*, 59 F.3d 771, 777 (8th Cir. 1995).

Furthermore, we agree with the trial court that the victim's statement was spontaneous, another one of the factors explicitly endorsed by the court in *Wright* as indicative of trustworthiness. See *Idaho* v. *Wright*, supra, 497 U.S. 821–22. A primary consideration in ascertaining the spontaneity of a statement by a child victim of sexual abuse is whether "there is evidence of prior interrogation, prompting, or manipulation by adults"; (internal quotation marks omitted) id., 826–27; such that one cannot confidently characterize the response as the product of the child's own perception or experience. In the present case, the victim's statement implicating "Daddy" was made in response to a wholly neutral question, namely, "what was wrong." The victim's unprompted and unrehearsed answer fits squarely into the category of spontaneous statements identified in *Wright* as indicative of trustworthiness.

In addition, the victim's mental state when she made the statement provides further indication of the statement's reliability. Yelding testified that immediately before she asked the victim what was wrong, the victim was behaving in a manner very unusual for a child her age, as if she were reaching "some kind of sexual climax . . . ." Thus, when Yelding asked the victim what was

wrong, the victim appeared to be reacting to some highly stressful or disturbing experience. In light of this strong circumstantial evidence of the victim's distressed mental state, it is highly unlikely that the victim was capable of intentionally concocting a story falsely implicating the defendant.[28]

The defendant contends that because extrinsic or independent evidence was necessary to establish a link between the defendant and the victim's reference to "Daddy," the admission of the statement violated the proscription announced in *Wright* against the use of such evidence to corroborate the trustworthiness of the declarant's statement. The defendant's argument, however, reflects a misperception of the United States Supreme Court's holding in *Wright* regarding the use of corroborative evidence in determining the reliability of the out-of-court statement.

*Wright* bars the use of independent corroborative evidence to support a statement's particularized guarantees of trustworthiness because reliance on such evidence gives rise to an undue risk that presumptively unreliable hearsay evidence will be admitted not on the basis of its inherent reliability but, rather, "by bootstrapping on the trustworthiness of other evidence at trial . . . ." Id., 823. Under *Wright*, therefore, evidence not directly related to the circumstances surrounding the making of the statement cannot be used to substantiate the statement's trustworthiness. See id., 822–23. *Wright*, however, does not prohibit the use of such evidence to explain the meaning or import of an *otherwise reliable* hearsay statement. In other words, the fact that the

---

[28] Indeed, the victim's mental state was similar to that which provides the basis for the admission of statements under the hearsay exception for spontaneous utterances, namely, that a startling event or condition produces nervous excitement in the declarant, thereby negating the likelihood of fabrication. See *State* v. *Kelly*, 256 Conn. 23, 42, 770 A.2d 908 (2001); Conn. Code Evid. § 8-3 (2), commentary.

state's attorney adduced testimony from Yelding[29] that was fully subject to cross-examination and in which Yelding explained the victim's reference to "Daddy" does not detract from the determination, predicated on the totality of the circumstances under which the statement was made, that the victim was particularly likely to have been telling the truth when she made the statement.[30] Consequently, we conclude that the trial court properly allowed the state's attorney to introduce the victim's statement through Yelding and that such a ruling, under the circumstances of the present case, did not violate the defendant's confrontation clause rights.

B

The defendant next contends that his rights under the confrontation clause were violated by virtue of the trial court's decision to allow the victim's mother to testify as to certain statements that the victim had made to her. Although we agree with the defendant that a portion of the mother's testimony should have been excluded, we nevertheless conclude that the improper admission of any hearsay evidence in this respect was harmless beyond a reasonable doubt.

On direct examination, the victim's mother testified that, in late May, 1987, she received a telephone call from Miranda, the day care center supervisor. When the state's attorney asked the victim's mother what Miranda had told her, the defendant objected on hear-

---

[29] We note, moreover, that there is nothing in the record to suggest that, when the victim used the term, "Daddy," she was referring to anyone other than the defendant.

[30] The defendant also contends that the victim's statement is untrustworthy because it is unclear what the victim meant by her response to Yelding's question. We disagree. Yelding testified that she questioned the victim only after she had observed her acting in an overtly sexual manner that was highly unusual for a child of the victim's tender age. Thus, a fact finder reasonably could infer from the victim's response that "Daddy" was responsible for "what was wrong" with her.

say grounds. The trial court excused the jury so that the state's attorney could make an offer of proof regarding the testimony that it sought to elicit.

The victim's mother then testified that Miranda had informed her that the victim was "gyrating . . . was withdrawn . . . [and] . . . complained about her private area." The victim's mother further testified that, sometime after receiving that telephone call from Miranda, she asked the victim what had happened. According to the victim's mother, the victim responded that "her Daddy hurt her in the private area."

The state's attorney then sought to introduce the statement that the victim had made to her mother under the residual exception to the hearsay rule. The state's attorney argued, inter alia, that the victim's statement was "credible and reliable" in light of the circumstances under which it was made. In addition, the state's attorney contended that the victim, by virtue of her actions and statements, exhibited a sexual knowledge unusual for someone her age. Over the defendant's objection, the trial court ruled that the state's attorney could introduce the victim's statement through the testimony of the victim's mother, reasoning that "[t]he statements [that the victim] made to her mother about what happened to her and the identity of the perpetrator of the acts upon her are necessary in this case, and . . . this is the exceptional case [in which the residual exception to the hearsay rule] should apply and will apply . . . . This event happened . . . approximately thirteen years ago. . . . [F]urthermore, the court finds that the statements are reliable. The statements that [the victim's mother] . . . would testify to are similar [to] statements that ha[ve] already been testified to by earl[ier] witnesses. The statements that were mentioned were not self-serving. The court finds that they are reliable and trustworthy in the totality of the record as it stands now . . . ."

Thereafter, the victim's mother testified, in the presence of the jury, that, after she had spoken with Miranda about the victim's behavior at the day care center, she spoke to the victim, who told her that "Daddy hurt her." The state's attorney then asked the victim's mother whether the victim had told her when the incident in question occurred. According to the victim's mother, although the victim did not state exactly when her daddy had hurt her, the victim did indicate that the incident had occurred "[s]ome time in May, about May 1st until the 17th." The state's attorney also asked the victim's mother whether the victim ever told her where the incident had occurred. Although the answer that the victim's mother gave reasonably may be characterized as unresponsive to the specific question posed,[31] she did indicate that the defendant was left alone with the victim on Sunday evenings when she went dancing, suggesting that the alleged incident may have occurred during this time. Thereafter, however, the victim's mother testified that she could not recall what the victim had told her regarding where the alleged incident had taken place.[32]

---

[31] As the following colloquy between the state's attorney and the victim's mother indicates, the testimony of the victim's mother regarding this issue was far from clear:

"Q. Did [the victim] tell you where [the incident] occurred?

"A. She was left alone with him. My mother-in-law and I go to Polish dancing every Sunday.

"Q. You'd go dancing every Sunday?

"A. Uh-huh. And I had to pick her up at 5 [p.m.].

"Q. Okay.

"A. And I not get home until 10 [p.m.].

"Q. Okay. So you left at 5 [p.m.] and you'd arrive back home at 10 [p.m.]?

"A. Uh-huh.

"Q. And so [the victim] said it occurred during that time, or what did she say, if you can recall?

"A. I don't remember."

[32] It is noteworthy that, after the victim's mother had testified, the trial court, outside the presence of the jury, stated that the testimony of the victim's mother was "very difficult to understand" due to a speech impediment that she possessed as a result of a previous stroke that she had suffered. Due to this difficulty, the trial court allowed the state's attorney to repeat

The defendant challenges the admission of each of the victim's statements through the testimony of the victim's mother on the ground that those statements lacked the particularized guarantees of trustworthiness necessary to withstand scrutiny under the confrontation clause. We review each statement in turn.

With respect to the victim's statement that "Daddy hurt her," that statement and the circumstances under which it was made are identical in all material respects to the victim's statement to Yelding and the circumstances under which that statement was made. See part II A of this opinion. Both statements, which were consistent with one another, were made by a very young child with no apparent motive to lie in response to neutral inquiries from different questioners. We therefore reject the defendant's challenge to the admission of the victim's statement that "Daddy hurt her" for the same reasons that we rejected his challenge to the admission of the victim's statement to Yelding.[33]

We next consider the defendant's claim that the trial court improperly permitted the victim's mother to testify that she had been told by the victim that the sexual assault occurred "[s]ome time in May, about May 1st until the 17th." The defendant asserts that the victim's statement should not have been admitted because it is "unrealistic" to presume that a three and one-half year old child "would state that [the sexual assault] occurred

some of the victim's mother's answers so that the jury could more readily understand her testimony.

[33] The defendant contends that the United States Supreme Court's admonition against the use of corroborative evidence in evaluating the trustworthiness of a hearsay statement; see *Idaho* v. *Wright*, supra, 497 U.S. 822; bars consideration of other similar hearsay statements by the victim for that purpose. Contrary to the defendant's claim, the court in *Wright* expressly recognized that consistent repetition of a statement by a child victim of sexual abuse is a factor that properly may be considered in determining whether any such statement is sufficiently reliable for purposes of the confrontation clause. Id., 821.

within a specific time span . . . ." We conclude that the victim's statement lacked adequate indicia of reliability to satisfy constitutional requirements. The challenged statement exhibits an ability to comprehend and to express concepts of time beyond that of a three and one-half year old child. Indeed, we cannot be certain about whether the statement was the victim's mother's characterization of what the victim told her regarding when the assault had occurred or whether the statement simply reflected the mother's own belief as to when the assault likely had occurred. In either event, the statement cannot reasonably be attributed to the declarant, and, therefore, its admission transcended the limits that the confrontation clause places on the admissibility of hearsay evidence at a criminal trial.

Nevertheless, we conclude that admission of the statement was harmless. As with other constitutional violations that are subject to harmless error analysis, the state has the burden of demonstrating that a confrontation clause violation was harmless beyond a reasonable doubt. See, e.g., *State* v. *Slimskey*, 257 Conn. 842, 859, 779 A.2d 723 (2001). "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 174, 777 A.2d 604 (2001).

Upon consideration of these factors, we are convinced that there is no reasonable possibility that the defendant was harmed by the admission of the victim's statement regarding the approximate time period during which the assault occurred. First, the state's substitute information charged the defendant with having sexually assaulted the victim on or about a date between January 1, 1987, and May 31, 1987. Consequently, the state was not required to prove that the defendant committed the offense during the first two weeks of May, 1987, and, therefore, the challenged testimony was not particularly important to the state's case. *State* v. *Bergin*, 214 Conn. 657, 667, 574 A.2d 164 (1990) (when "time is not of the essence or [the] gist of the offense, the precise time at which it is charged to have been committed is not material" [internal quotation marks omitted]). Indeed, inasmuch as the defendant had resided with the victim and her mother for approximately four to five months before the abuse was discovered, the issue of whether that abuse occurred in May, 1987, or in the preceding weeks or even months, had no bearing on the state's case.

Second, the evidence that the victim had been sexually abused was overwhelming: (1) family members and day care personnel observed the victim acting in a strange manner, one that suggested that the victim had been subject to sexual abuse; (2) the victim's external genitalia were red, irritated and swollen, and her hymen had been torn; (3) Currao, the pediatrician, testified that the victim's injuries were consistent with digital or penile penetration, and that sexual abuse likely was the cause of those injuries; and (4) the victim expressly told her mother and Detective Betterini that "Daddy" had touched her and had hurt her in her genital area. Indeed, during closing arguments, defense counsel acknowledged that the state had proven sexual abuse

in stating: "[T]here's no doubt that [the victim] was sexually abused. The question is by who[m]."

Finally, the victim, who referred to the defendant as "Daddy," repeatedly and consistently identified him as the person who had sexually abused her. Indeed, the defendant does not claim that the victim was referring to someone other than the defendant when she used the term "Daddy." Under the circumstances, therefore, the improper admission of the victim's statement regarding the approximate time frame during which the sexual abuse occurred was harmless beyond a reasonable doubt.

The defendant next contends that the trial court improperly allowed the victim's mother to testify that the sexual assault occurred while she was out dancing and the victim was home alone with the defendant. The specific colloquy at issue; see footnote 31 of this opinion; hardly is a model of clarity. Indeed, the mother's initial answer to the question of the state's attorney about whether the victim had told her where the assault occurred was not truly responsive. The victim's mother testified that the victim "was left alone with him. My mother-in-law and I go to Polish dancing every Sunday." Moreover, when the state's attorney thereafter repeated the question, the victim's mother testified that she did not remember what the victim had said. In light of the mother's difficulty in expressing herself during her testimony; see footnote 32 of this opinion; and in light of her testimony that she did not remember what the victim had said, it appears that the mother's initial response reflected her own belief as to the timing and location of the assault. This conclusion is buttressed by the fact that the jury undoubtedly recognized that the three and one-half year old victim could not have expressed herself in such terms. Construed as the victim's mother's own observation, the testimony did not include a hearsay component inasmuch as the victim's

mother was testifying as to her firsthand knowledge regarding the defendant's opportunity to assault the victim. Such testimony was relevant to establish the defendant's opportunity to commit the offense. We believe, therefore, that the jury most likely viewed the challenged testimony as reflecting the personal belief of the victim's mother as to the timing and location of the assault, namely, on a Sunday evening at the home of the victim when the victim's mother and her mother-in-law were out dancing.

To the extent that the testimony of the victim's mother could be viewed as incorporating the victim's statement regarding the timing and location of the assault, however, we agree with the defendant that the victim's statement is inherently untrustworthy because it is entirely implausible that the three and one-half year old victim could express herself in the manner attributed to her. Nevertheless, in the unlikely event that the jury construed the testimony of the victim's mother as incorporating the victim's *out-of-court* statement regarding the timing and location of the assault, we conclude that the admission of that hearsay statement was harmless. As we previously have indicated, the timing of the assault was not a material component in the state's case. Moreover, the evidence that the victim had been sexually abused was overwhelming, and the victim consistently identified the defendant as the perpetrator. Finally, the victim's mother ultimately indicated that she could not remember what the victim had said, if anything, as to the timing and location of the assault. Thus, even if the jury had understood the challenged testimony as incorporating the victim's statement, its admission was harmless beyond a reasonable doubt.[34]

## C

The defendant also contends that the trial court improperly allowed Detective Betterini to testify about

---

[34] For the same reasons, we reject the defendant's challenge to Betterini's testimony that the victim's mother told him that the alleged incident had occurred on "May 17, 1997, when she left for a period of time to go out to go

certain statements that the victim had made to him because those statements lacked sufficient indicia of reliability. We reject the defendant's claim.

Betterini testified that, as part of his investigation, he interviewed the victim and the victim's mother. According to Betterini, the victim told him that "her [D]addy touched her buggy" and that "her [D]addy had touched her with his buggy . . . ." Betterini also testified that he showed the victim anatomically correct diagrams of an adult male and preschool age female, and that the victim used the term "buggy" to identify the male and female genitalia in the diagrams. Finally, Betterini testified that the victim identified "[t]he man who was living with [her] mother" as "Daddy."

Betterini testified extensively regarding the circumstances surrounding his interview of the victim. In particular, he indicated that he spoke to the victim, whom he described as bright but shy, in the presence of her mother. Betterini also indicated that, whenever the victim wanted to take a break, he allowed her to do so, and that he tried to make her feel comfortable and to minimize the stress of the situation. In addition, Betterini testified that he did not ask leading questions or otherwise influence the victim's responses in any way. Betterini further noted that the victim maintained the same version of the events throughout the interview.

We conclude that the trial court properly allowed Betterini to testify regarding the statements that the victim made to him for essentially the same reasons that we have approved the court's rulings with respect to the admissibility of the victim's statements to Yelding and certain of her statements to the victim's mother. The victim's statements to Betterini were consistent with those previous statements to Yelding and the victim's mother. Furthermore, the record reveals that Bet-

dancing." Even if we assume that Betterini's testimony in this regard contained inadmissible hearsay, the admission of that testimony also was harmless beyond a reasonable doubt.

terini posed neutral questions to the victim, who was neither pressured to cooperate with Betterini nor prompted to implicate the defendant. Finally, the victim had no motive to lie either about the fact that she had been sexually abused or about the identity of her assailant.[35] Because these factors are strong indicators that the victim's responses to Betterini were trustworthy, we are satisfied that the admission of those statements comported with the dictates of the confrontation clause.

## D

Finally, the defendant contends that the trial court improperly allowed Betterini to testify as to certain statements that the victim's mother had made to him during his interview of the victim. We agree with the defendant but conclude that the admission of the challenged testimony was harmless beyond a reasonable doubt.

Betterini testified that during his interview with the victim, the victim's mother stated that the victim had told her that "[D]addy hurt me," and that "Daddy put

[35] The defendant contends that, because Betterini did not interview the victim until approximately two weeks after the victim had made the initial statements to day care center personnel, there was ample time for the victim's mother to have influenced the victim's perception regarding the abuse. In support of his contention, the defendant refers to the fact that the victim's statements became more specific or detailed with the passage of time. For example, the defendant notes that the victim's initial statements to her mother were in the nature of "[D]addy hurt [me]," whereas the statements that the victim made to Betterini were more specific as to what "Daddy" had done to her. Although the victim's statements to Betterini may be characterized as somewhat more detailed than some of the victim's earlier statements, there simply is no evidence to suggest that that greater specificity was the product of any coaching or prompting on the part of the victim's mother. Nor were the victim's statements, considered in their entirety, inconsistent in any way. Indeed, the victim repeatedly and consistently identified "Daddy" as the person who had harmed her. We therefore reject the defendant's contention that the victim's statements to Betterini were unreliable merely because they were more specific than statements that the victim previously had made regarding the matter.

his buggy into my buggy." The defendant objected to this testimony on the ground that it was inadmissible hearsay within hearsay. The trial court overruled the defendant's objection and allowed the state's attorney to introduce those statements through the testimony of Betterini under the residual exception to the hearsay rule.

"Hearsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception." Conn. Code Evid. § 8-7; see also *State* v. *Lewis*, 245 Conn. 779, 802, 717 A.2d 1140 (1998) ("[w]hen a statement is offered that contains hearsay within hearsay, each level of hearsay must itself be supported by an exception to the hearsay rule in order for that level of hearsay to be admissible"). Betterini's testimony about what the victim's mother told him regarding what the victim had told her is hearsay within hearsay. In the absence of a showing by the state that both levels of hearsay possessed particularized guarantees of trustworthiness, the statements of the victim's mother regarding what the victim had told her were not admissible under the residual exception to the hearsay rule and, consequently, could not endure scrutiny under the confrontation clause. We conclude that the state has failed to demonstrate the existence of particularized guarantees of trustworthiness that would support the admissibility of the statements of the victim's mother to Betterini under the residual exception to the hearsay rule. Thus, the trial court improperly allowed Betterini to testify as to the statements of the victim's mother.

We also conclude, however, that the improper admission of those statements was harmless beyond a reasonable doubt.[36] The statements of the victim's mother were probative of whether the victim had been sexually

---

[36] The defendant also contends that the trial court improperly allowed Betterini to testify as to a statement that the victim's mother had made to him regarding the victim's identification of "Daddy" as the defendant. We conclude that this testimony also constitutes inadmissible hearsay within hearsay. For reasons that we have explained and hereafter explain in this opinion, however, we also conclude that the admission of Betterini's testimony in this regard was harmless beyond a reasonable doubt.

abused and the identity of the abuser. With respect to the first issue, the evidence of sexual abuse was overwhelming; indeed, the defendant did not seriously dispute that fact. See part II B of this opinion. With respect to the issue of identity, the testimony of Yelding, the victim's mother and Betterini established that the victim, herself, repeatedly had identified the defendant as her assailant. In addition, Miranda's report stated that the victim had identified "Daddy" as the person who had "touched her" inappropriately.[37] Thus, Betterini's testimony as to what the victim's mother had told him about the victim's statements to her merely was cumulative in relation to other properly admitted—and highly probative—evidence that directly linked the defendant to the sexual assault. Consequently, we conclude that the improper admission of the statements of the victim's mother through Betterini's testimony was harmless beyond a reasonable doubt.[38]

### III

The defendant also contends that the trial court abused its discretion in permitting the state's attorney to introduce evidence of the defendant's alleged prior sexual assault of another child for the purpose of establishing (1) a common plan or scheme, and (2) identity. We reject the defendant's claim that the trial court abused its discretion in allowing the state's attorney to introduce that prior misconduct evidence to prove a common plan or scheme. Although we agree with the defendant that the trial court improperly allowed the state's attorney to introduce that evidence for the purpose of establishing

[37] The defendant does not claim that the trial court improperly allowed the state's attorney to introduce this report into evidence.

[38] The defendant contends that Betterini's testimony that the victim's "mother knew Daddy as [the defendant]" was inadmissible hearsay. We need not determine whether this testimony contained hearsay or, if so, whether it was admissible under an exception to the hearsay rule because it was merely cumulative of the trial testimony of the victim's mother, in which she identified the defendant as "Daddy," as well as other admissible evidence identifying the defendant as "Daddy." Consequently, even if we were

identity, we conclude that its admission for that purpose was harmless.

The following additional facts and procedural history are necessary to our determination of this issue. Outside the presence of the jury, the state's attorney informed the court that, for purposes of establishing (1) a common plan or scheme, and (2) the identity of the perpetrator, he intended to elicit testimony from the defendant's biological daughter that she, like the victim, had been sexually assaulted by the defendant as a young girl. The defendant objected, and the state's attorney made an offer of proof regarding the proffered testimony.

In support of the state's attorney's claim concerning the admissibility of that testimony, the defendant's daughter testified that, in August, 1986, on or about her ninth birthday, the defendant picked her up in preparation for a trip to Ohio that she and the defendant were taking. The defendant's daughter testified that, before departing for Ohio, the defendant took her to his apartment where he touched her "breast area and lower area" and inserted his finger into her vagina. The defendant's daughter testified further that, on the trip to Ohio, the defendant again molested her. Specifically, the defendant's daughter testified that while they were stopped at a truck stop en route to Ohio, the defendant "put it in me. He didn't penetrate me, but he did enter it into me." When the state's attorney inquired whether there was "at least partial penile penetration," the defendant's daughter responded in the affirmative.

The state's attorney contended that the defendant's alleged sexual assault of his daughter was sufficiently similar to the defendant's sexual assault of the victim that the state was entitled to use that evidence of a similar, uncharged criminal act for the purpose of establishing the defendant's identity as the perpetrator of the assault of the victim and also for the purpose of establishing the defendant's common plan or scheme to abuse

to assume that Betterini's testimony had incorporated inadmissible hearsay, the admission of that testimony was harmless beyond a reasonable doubt.

young girls sexually. The defendant objected to the admission of the prior misconduct evidence, claiming that any similarities between the charged and uncharged assaults were insufficient to warrant the admission of the proffered evidence under either theory. The defendant alternatively claimed that the prior misconduct evidence should have been excluded because it was more prejudicial than probative.

The trial court overruled the defendant's objection, concluding that "[t]here [were] sufficient similarities in both cases to justify admitting the evidence for the purpose of showing identity and common scheme or plan." The trial court found that the following similarities supported its conclusion: (1) both victims were young girls; (2) the defendant had a relationship with both of the victims' mothers; (3) the defendant was not married to either victim's mother; (4) the defendant purportedly had engaged in similar conduct with the victims, namely, vaginal penetration; (5) the defendant had access to the victims because of a familial-type relationship with both of them; and (6) the alleged sexual assault of the defendant's daughter occurred between five and nine months before the sexual assault of the victim for which the defendant was criminally charged. The court also concluded that the probative value of the evidence outweighed its prejudicial effect.

Following the court's ruling, the jury was recalled and the defendant's daughter thereupon repeated the testimony that she had given during her voir dire examination. After she had completed her direct examination testimony and before cross-examination, the trial court, sua sponte, gave the jury a cautionary instruction in which it directed the jury to consider the testimony, if at all, only in regard to the issues of identity and common plan or scheme.[39] In its final instructions to the jury at

---

[39] Immediately after the defendant's daughter had completed her direct examination testimony, the trial court instructed the jury as follows: "I want to caution you about the evidence which you just heard from this witness . . . concerning the sexual assaults allegedly committed upon her by the defendant. I permitted you to hear that evidence for a limited purpose. The

the conclusion of the case, the trial court reiterated the limited purpose for which the testimony of the defendant's daughter could be considered.[40]

"We begin our review of the trial court's action by noting that [a]s a general rule, evidence of prior misconduct

evidence offered by the state of prior acts of misconduct of the defendant is not being admitted to prove the bad character of the defendant or his tendency to commit criminal acts. That is, the evidence is not to be used by you as evidence that the defendant had a propensity to commit the crimes with which he is charged in this case, or since he did things, if he did them, as [the defendant's daughter] claims, that he must have committed the crimes alleged in this case. Such evidence is being admitted solely to show or establish a plan or scheme in the commission of criminal acts or the identity of the person who committed the crime charged.

"Now, remember, the information charges this defendant with acts supposedly committed upon [the victim]. He is not charged in this case with having done anything to [his daughter] . . . . I permitted you to hear this evidence about what [the defendant's daughter] claims because of the claimed similarities between what [the defendant's daughter] testified about and what . . . [Yelding, Miranda and the victim's mother] testified about what [the victim] told them about what happened to her and who did it.

"The issue of the similarities is an issue for you to determine, and if you determine that the similarities are strong enough to be like a signature or fingerprint, you may use that in determining whether or not you believe that what the witnesses I just mentioned of [the victim's] account of what happened is true. On the other hand, if you, the jury, determine that the similarities are not strong enough, then you should completely disregard [the defendant's daughter's] testimony, and it should have no influence on your consideration of this case. I will talk to you further about the limited use, if any, of [the defendant's daughter's] testimony when I give you my final instructions."

[10] In its final instructions to the jury at the conclusion of the case, the trial court stated: "Now, in this case, you heard testimony from a witness . . . the defendant's daughter, wherein she testified about certain sexual acts committed on her by the defendant. This evidence offered by the state of prior acts of misconduct of the defendant was not admitted to prove the bad character of the defendant or his tendency to commit criminal acts. Such evidence is being admitted solely to show or establish a plan or scheme in the commission of criminal acts charged in the information or the identity of the person who committed the crimes charged.

"Now, evidence from [the defendant's daughter] cannot be used by you to show that the defendant had a propensity to commit a crime or since he had committed those acts on [his daughter], he must have done what is alleged in this case. That testimony from [the defendant's daughter] may be used by you but only for a limited purpose or not at all. That evidence was offered by the state to show that there are similarities between the conduct on [the victim] and the conduct on [the defendant's daughter] that

is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior." (Citation omitted; internal quotation marks omitted.) *State v. Nunes*, 260 Conn. 649, 684, 800 A.2d 1160 (2002); see also Conn. Code Evid. § 4-5 (a). Evidence of prior misconduct may be admitted, however, when the evidence is offered for a purpose other than to prove the defendant's bad character or criminal tendencies. Conn. Code Evid. § 4-5 (b). Exceptions to the general rule precluding the use of prior misconduct evidence have been recognized in cases in which the evidence is offered to prove, among other things, intent, identity, motive, malice or a common plan or scheme. See *State v. Greene*, 209 Conn. 458, 464–65, 551 A.2d 1231 (1988); *State v. Johnson*, 76 Conn. App. 410, 415, 819 A.2d 871 (2003); see also Conn. Code Evid. § 4-5 (b).

indicate that this was a unique way or technique or like [a] signature, like [a] fingerprint, of the way this defendant did these things.

"It is up to you to determine whether or not you believe [the] testimony of [the defendant's daughter] and/or the testimony of [Yelding, Miranda, the victim's mother] or Detective Betterini about what [the victim] told them and whether or not there is sufficient similarity in what supposedly was done with each of these girls, to draw conclusions that help you determine whether or not the defendant did these things to [the victim].

"This is entirely up to you. If you find there is not sufficient similarity here, then forget [the defendant's daughter's] testimony, but if you think there is sufficient similarity and believe it, then you may use it to determine whether or not these things were done to [the victim]. It is up to you and you alone to determine whether or not there are sufficient similarities that it becomes of some assistance to you in determining whether or not these things were done as alleged on [the victim].

"Again, you may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find [that] it logically, rationally and conclusively supports the issues for which it is being offered by the state but only as it may bear here on the issues which I have just discussed.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally and conclusively support the issues for which it is being offered by the state, namely, to show a common scheme or plan or identity of the perpetrator of the crimes charged, then you may not consider that testimony for any purpose."

"In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Nunes*, supra, 260 Conn. 685.

"The first prong of the test requires the trial court to determine if an exception applies to the evidence sought to be admitted." *State* v. *Kulmac*, 230 Conn. 43, 61, 644 A.2d 887 (1994). In the present case, the trial court permitted the state's attorney to introduce evidence of the defendant's alleged sexual assault of his daughter to prove: (1) a common scheme or plan on the part of the defendant to abuse young girls sexually; and (2) the identity of the perpetrator of the sexual abuse alleged in the present case. The defendant claims that the trial court abused its discretion in allowing the admission of this evidence under either exception.

## A

We turn first to the defendant's contention that the trial court improperly permitted the state's attorney to elicit the prior misconduct evidence to show a common plan or scheme on the part of the defendant. "When evidence of [prior uncharged misconduct] is offered to show a common [plan or scheme], the marks which the . . . charged [and uncharged] offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty

of the other. . . . In order to assess the defendant's claim, we must examine the [prior uncharged misconduct] evidence and compare it to the charged offense. . . .

"To guide this analysis, we have held that [e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan whe[n] the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness. . . . We are more liberal in admitting evidence of other criminal acts to show a common scheme or pattern in [trials of] sex related crimes than [in trials of] other crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *George B.*, 258 Conn. 779, 791–92, 785 A.2d 573 (2001).

Applying these principles, we conclude that the trial court did not abuse its discretion in allowing the state's attorney to elicit the testimony of the defendant's daughter for the purpose of establishing a common plan or scheme. First, the incident involving the defendant's daughter occurred approximately eight to nine months before the defendant's sexual assault of the victim. Thus, the prior uncharged offense was not remote in time in relation to the charged offense. Cf., e.g., *State* v. *Kulmac*, supra, 230 Conn. 62 (despite seven year hiatus between prior misconduct and charged offense, trial court did not abuse discretion in concluding that misconduct evidence "was sufficiently recent to have probative value"). Second, there are many similarities between the defendant's alleged abuse of his daughter and his abuse of the victim. In each case, the defendant: (1) sexually abused a young girl; (2) had a close relationship with the girl's mother, but was not married to her; (3) had access to the victim of the abuse because of his familial or familial-type relationship with her; (4) had ample opportunity to be alone with each victim;

and (5) engaged in assaultive behavior consisting of digital or penile penetration of the vagina. Although the age difference between the victim and the defendant's daughter was approximately five years, both were young, prepubescent girls, and the defendant occupied a paternal role in their lives. In light of these similarities between the charged and uncharged misconduct, and giving appropriate deference to the ruling of the trial court, we conclude that the trial court did not abuse its discretion in determining that the testimony of the defendant's daughter was probative of a common plan or scheme of behavior toward young girls. See, e.g., *State* v. *George B.*, supra, 258 Conn. 789–92 (defendant exhibited common scheme of behavior when both victims were related to one another and to defendant, and sexual misconduct occurred at same location); *State* v. *Kulmac*, supra, 62–63 (defendant engaged in common plan or scheme because all three victims were young girls, defendant maintained close relationship with victims' families and defendant's sexual abuse of each victim bore certain similarities); *State* v. *Esposito*, 192 Conn. 166, 173–74, 471 A.2d 949 (1984) (defendant exhibited common scheme of behavior inasmuch as two victims were similar in age, and defendant had consumed alcohol before using knife to force each victim to engage in oral sex and then vaginal intercourse); *State* v. *Hauck*, 172 Conn. 140, 146–47, 374 A.2d 150 (1976) (trial court reasonably found common plan or scheme when defendant schoolteacher used position of authority to obtain or seek sexual favors from two female students in return for favorable academic evaluations).

Having determined that the evidence regarding the defendant's alleged sexual abuse of the defendant's daughter was relevant and material, we now must address the issue of whether the evidence nevertheless should have been excluded because it was unduly preju-

dicial. As we have indicated, "[t]he primary responsibility for conducting the balancing test to determine whether the evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." *State v. George B.*, supra, 258 Conn. 793. In the present case, the state's attorney presented a lengthy offer of proof, and the trial court entertained argument from both parties. Following the offer of proof and argument of counsel, the trial court expressly found that the probative value of the prior misconduct evidence outweighed its prejudicial effect. In light of the marked similarities between the charged and uncharged misconduct, the probative value of the latter was significant in regard to the issue of common plan or scheme. Moreover, the trial court repeatedly instructed the jury that the evidence was not admitted to prove the defendant's bad character or criminal tendencies. See footnotes 36 and 37 of this opinion. Thus, although the prior misconduct evidence undoubtedly gave rise to some prejudice, we cannot say that its prejudicial effect was so great as to outweigh its probative force. We conclude, therefore, that the trial court did not abuse its discretion in permitting the state's attorney to introduce the evidence of the defendant's prior misconduct to establish a common plan or scheme.[41]

---

[41] According to the dissent, the test that we apply to determine the admissibility of prior sexual misconduct evidence for the purpose of establishing a common plan or scheme is insufficient to assure that the prior misconduct evidence is not merely evidence of a "pattern or systematic course of conduct," but, rather, evidence of a "true" plan or scheme such that the charged and uncharged conduct are "related to an overall scheme in the defendant's mind." In other words, the dissent asserts that the test established by this court for the admission of common plan or scheme evidence in sexual assault cases is predicated on "the theory that a pattern or systematic course of conduct is sufficient to establish a plan," and that such conduct, in fact, is inadequate to prove a common plan or scheme. The defendant, however, did not raise this claim, and, therefore, we do not address it. See, e.g., *State v. Luurtsema*, 262 Conn. 179, 204, 804 A.2d 223 (2002).

## B

We next consider the defendant's claim that the trial court abused its discretion in permitting the state's attorney to introduce the evidence of the defendant's prior misconduct to establish the defendant's identity as the perpetrator of the sexual assault alleged in the present case. "The first threshold for the use of evidence of other crimes or misconduct on the issue of identity is that the methods used be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . [I]n proffering [prior misconduct] evidence [t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature." (Citation omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 163, 665 A.2d 63 (1995). "There should [be no] significant differences in the context and modus operandi of the crimes." *State* v. *Payne*, 219 Conn. 93, 100, 591 A.2d 1246 (1991). "In order to determine if this threshold criterion for admissibility has been met, we must examine the proffered evidence and compare it to the charged offenses." *State* v. *Figueroa*, supra, 163.

In comparing the proffered misconduct evidence and the crimes with which the defendant was charged, "[t]he fact that some of the similarities between the offenses were legal or relatively common occurrences when standing alone does not . . . negate the uniqueness of the offenses when viewed as a whole. It is the distinctive combination of actions which forms the signature or modus operandi of the crime . . . and it is this criminal logo which justifies the inference that the individual who committed the first offense also

committed the second." (Citations omitted; internal quotation marks omitted.) Id., 164. In other words, "[t]he process of construing an inference of [i]dentity . . . usually [consists of] adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated. The process thus corresponds accurately to the general principle of relevancy." (Internal quotation marks omitted.) Id.

In the present case, the shared similarities between the charged and uncharged misconduct, though substantial, are not so "unusual and distinctive as to be like a signature." Id., 163. In contrast to the comprehensive testimony of the defendant's daughter regarding the sexual assault that she allegedly experienced at the hands of the defendant, a similarly detailed account of the defendant's sexual assault of the victim could not be obtained in light of the victim's tender age. The absence of such details renders the evidence insufficient "to narrow the circle of possible suspects significantly." *State* v. *Ibraimov*, 187 Conn. 348, 354, 446 A.2d 382 (1982). We simply cannot say, therefore, that the two sexual assaults, although similar, shared such unique or distinctive characteristics as to warrant a finding that they effectively bore the signature of the same person. Consequently, we conclude that the trial court abused its discretion in permitting the state's attorney to introduce evidence of the defendant's prior misconduct for the purpose of establishing that the defendant was the perpetrator of the sexual assault in the present case.

Our conclusion that the trial court abused its discretion in admitting the prior misconduct evidence to establish identity, however, does not end our inquiry.

We also must determine whether the impropriety was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001). For purposes of the present case, we need not choose between the two formulations or decide whether there is any functional difference between them because we conclude that the defendant has not satisfied his burden of proving harm under either formulation of the standard.

As we previously have explained; see part III A of this opinion; the trial court properly allowed the state's attorney to introduce the prior misconduct evidence to prove a common plan or scheme. Thus, that evidence was properly before the jury, albeit under a different exception to the general rule against the admission of prior misconduct evidence. Moreover, because the defendant never seriously disputed that the victim had been sexually assaulted, the only contested issue in the case was whether the defendant was the person who had committed the assault. Thus, the evidence of the defendant's prior misconduct, which tended to establish a common plan or scheme, was relevant to establish that the defendant, and not someone else, had perpetrated the assault of the victim. In essence, therefore, the prior misconduct evidence was admitted under the common plan or scheme exception to establish circum-

stantially the identity of the perpetrator. In such circumstances, and in light of the trial court's instructions emphasizing that the prior misconduct evidence was not to be considered for the purpose of determining whether the defendant had a propensity to commit the crimes with which he had been charged, we conclude that the improper admission of that prior misconduct evidence to prove identity was harmless.

## C

As we have explained in part III A and B of this opinion, the same prior misconduct evidence that was admissible to establish a common plan or scheme was inadmissible to prove identity. We take this opportunity to explain this apparent incongruity in our application of those two exceptions to the general rule barring the use of prior misconduct evidence.

This very issue was identified and addressed by Judge (now Justice) Borden in *State* v. *Murrell*, 7 Conn. App. 75, 507 A.2d 1033 (1986). As he explained for the Appellate Court in *Murrell*: "Where evidence of prior misconduct is sufficiently similar to the facts and circumstances of the charged offense to be admissible for the purpose of proving that the same individual committed both crimes, i.e., to be admissible under the identity exception, then there is some likelihood that the evidence is also relevant and admissible for the purpose of proving a common scheme or system of criminal activity. . . . Where, however, that evidence is not sufficiently similar to the charged offense to be admissible for the purpose of proving identity, but is offered into evidence in the state's case-in-chief for the purpose of proving a common scheme, then the similarity factor alone logically cannot be determinative, particularly where . . . identity is the principal element in dispute. This conclusion follows from the observation that evidence of a common scheme also

tends to prove identity. . . . To conclude otherwise would necessitate our adoption of the inherently contradictory position that the same evidence, which is not sufficiently similar to the charged misconduct to be admissible for the purpose of proving identity, may nevertheless be sufficiently similar for the purpose of proving a common scheme or system of criminal activity, and, therefore, admissible under that theory to prove the principal factual element of the charged crimes in dispute, namely, identity." (Citations omitted.) Id., 88–89.

This "inherently contradictory position" is most likely to arise in sexual assault or abuse cases inasmuch as this court has adopted a more liberal standard in such cases for the admission of prior misconduct evidence under the common plan or scheme exception even when the misconduct evidence is admitted under that exception for the purpose of establishing circumstantially the identity of the perpetrator. See *State* v. *Kulmac*, supra, 230 Conn. 56, 62–63; cf. *State* v. *Hauck*, supra, 172 Conn. 147. This less restrictive approach, which we first articulated in *State* v. *Hauck*, supra, 145–47, and which generally is followed by a majority of states; see *People* v. *Donoho*, 204 Ill. 2d 159, 175–76, 788 N.E.2d 707 (2003) (listing states with liberal approach to admissibility of prior misconduct evidence in sex crime cases); is supported by two primary considerations, one of which is particularly relevant in child molestation cases.

First, in sex crime cases generally, and in child molestation cases in particular, the offense often is committed surreptitiously, in the absence of any neutral witnesses. Consequently, courts allow prosecutorial authorities greater latitude in using prior misconduct evidence to bolster the credibility of the complaining witness and to aid in the obvious difficulty of proof. See, e.g., *United States* v. *Castillo*, 140 F.3d 874, 883 (10th Cir. 1998);

*People* v. *Covert*, 249 Cal. App. 2d 81, 88, 57 Cal. Rptr. 220 (1967); *People* v. *Donoho*, supra, 204 Ill. 2d 177–78; *Commonwealth* v. *King*, 387 Mass. 464, 472, 441 N.E.2d 248 (1982); *State* v. *Forbes*, 161 Vt. 327, 331, 640 A.2d 13 (1993); *Daniel* v. *State*, 923 P.2d 728, 735 (Wyo. 1996). Second, because of the unusually aberrant and pathological nature of the crime of child molestation, prior acts of similar misconduct, as opposed to other types of misconduct, are deemed to be highly probative because they tend to establish a necessary motive or explanation for an otherwise inexplicably horrible crime; see, e.g., *Ward* v. *State*, 236 Ark. 878, 883, 370 S.W.2d 425 (1963); *Acuna* v. *State*, 332 Md. 65, 75, 629 A.2d 1233 (1993); *State* v. *Forbes*, supra, 331; see also 140 Cong. Rec. 24,799 (1994), remarks of Senator Robert Dole in support of adoption of rules 413 through 415 of the Federal Rules of Evidence[42] ("[i]n child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant—a sexual or sado-sexual interest in children—that simply does not exist in ordinary people"); and assist the jury in assessing the probability that a defendant has been falsely accused of such shocking behavior.[43] See, e.g., *State* v. *Forbes*, supra, 332–33; see also 137 Cong. Rec. 6033 (1991) (United States Department of Justice summary of § 801 of proposed Comprehensive Violent Crime Control Act of 1991, which

---

[42] Rule 413 of the Federal Rules of Evidence provides in relevant part: "(a) In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant. . . ."

Rule 414 of the Federal Rules of Evidence provides in relevant part: "(a) In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant. . . ."

[43] We note that both of these reasons are fully applicable to the present case, which involves the defendant's sexual assault of a child.

incorporated proposed rules 413 through 415 of Federal Rules of Evidence) ("[i]t is inherently improbable that a person whose prior acts show that he is in fact a rapist or child molester would have the bad luck to be later hit with a false accusation of committing the same type of crime or that a person would fortuitously be subject to multiple false accusations by a number of different victims").[44]

We have not been asked to reconsider our less restrictive approach to the admissibility of prior misconduct evidence in sex crime cases and, therefore, have no reason to revisit the soundness of the reasons underlying our law in this area. We emphasize, however, that our approach does not vest trial courts with carte blanche to allow the state to introduce any prior sexual misconduct evidence against an accused in sex crime cases. Rather, trial courts first must carefully determine whether the prior misconduct evidence sought to be admitted is being offered for a purpose other than to establish the defendant's bad character or criminal tendencies and whether that evidence falls within an exception to the general rule barring admissibility. See Conn. Code Evid. § 4-5 (a) and (b); see also, e.g., *State* v. *George B.*, supra, 258 Conn. 791–92. Courts then must scrupulously evaluate whether the probative value of such evidence outweighs the prejudicial effect that invariably flows from its admission. See, e.g., *State* v.

---

[44] Although the rationale for the less restrictive approach to the admissibility of prior sexual misconduct evidence in sex crime cases has not escaped criticism; see, e.g., 1 C. McCormick, Evidence (5th Ed. 1999) § 190, pp. 669–70; it remains persuasive in many quarters, including the United States Congress, which adopted rules 413 through 415 of the Federal Rules of Evidence. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 320935, 108 Stat. 1796, 2135–37 (1994). In addition, Alaska, Arizona, California, Illinois and Texas have adopted similar provisions in their respective state evidence codes. See Alaska R. Evid. 404 (b) (2) and (3); Ariz. R. Evid. 404 (c); Cal. Evid. Code § 1108 (Deering Sup. 2002); 725 Ill. Comp. Stat. Ann. 5/115-7.3 (West 2002); Tex. Crim. Proc. Code Ann. § 38.37 (Vernon Sup. 2003).

*George B.*, supra, 793–94; see also Conn. Code Evid. § 4-3.

## IV

The defendant finally claims that his federal and state constitutional rights to a trial by an impartial jury were violated by virtue of the trial court's failure to poll the jurors regarding: (1) their possible exposure to media coverage of the trial; and (2) possible juror impropriety based on certain statements made by a juror who ultimately was excused. We disagree.

Before addressing the merits of the defendant's claims, we review the governing legal principles. "Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment [we previously have held, pursuant to our supervisory authority over the administration of justice, that] a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality." (Citations omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 295–96, 750 A.2d 1059 (2000).

"Th[e] form and scope [of that preliminary inquiry] may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the

other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995). "We previously have instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jur[or] misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jur[or] misconduct; and (3) the state's interests of, inter alia, jur[or] impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jur[or] [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jur[or] misconduct can fairly be characterized as an abuse of its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 296–97. We now turn to the defendant's claims.

## A

The defendant first contends that the trial court abused its discretion in failing to poll the jurors to determine whether they were aware of certain media coverage of the trial. The defendant's claim lacks merit.

The following additional facts and procedural history are necessary to our resolution of the defendant's claim. On September 6, 2000, after the completion of jury selection but before the jury had been sworn,[45] the defendant informed the court that two newspaper articles regarding the case had been published on August 26, 2000, one in The Herald, which is based in New Britain, and the other in The Bristol Press. The defendant characterized these articles as "hav[ing] some detail in [them] that's rather disturbing."[46] The defendant requested that the trial court "poll the jury to see if they've read anything in any local newspaper or anything about th[e] case and just warn them not to." The defendant, however, made no request that the court make any specific inquiry into whether any juror or jurors had read either of the two articles, and did not indicate that he had any reason to believe that any juror actually had seen one or both of the two articles.

The trial court denied the defendant's request, noting that the jurors previously had been instructed to avoid media coverage of the case and that there was no indication that the jurors had disregarded those instructions. The court further observed that the two articles identified by the defendant were brief and "not notorious or anything." The court also observed that, during the voir dire of prospective jurors, counsel had inquired of those prospective jurors whether they had had any exposure to the case, and each such venireperson had answered in the negative. Finally, after noting that, "bringing these

---

[45] See Practice Book § 42-14 (a).

[46] The defendant provided the court with copies of the two articles.

things to light [sometimes] is more harmful than letting [them] be," the court indicated that it was open to the possibility of taking further action in the event that the defendant presented "specific information" in support of his request to have the court poll the jury.

We conclude that the facts that the defendant presented to the court simply did not "indicate the possibility of juror misconduct or partiality"; *State* v. *Mukhtaar*, supra, 253 Conn. 296; so as to trigger a duty on the part of the court to conduct even a preliminary inquiry. Id. The defendant presented no evidence that any juror had read or discussed either of the two brief articles. Rather, the defendant now contends that the mere existence of the articles required the court to poll the jury. We reject this contention in light of the fact that the court previously had instructed the jurors, as they each had been selected to serve on the jury in the defendant's case, to avoid exposure to any media accounts of the case. In the absence of any indication to the contrary, we presume that the jurors followed the court's instructions. E.g., *State* v. *Copas*, 252 Conn. 318, 331, 746 A.2d 761 (2000). Under the circumstances, therefore, including the extremely limited media coverage of the case, we conclude that the trial court was under no obligation to poll the jury or otherwise to take any further action regarding the matter.[47]

## B

The defendant also contends that the trial court abused its discretion in failing to poll the jurors concern-

[47] Indeed, even if we were to conclude that the trial court was obligated to conduct a preliminary hearing, the court properly discharged that responsibility. The court inquired of both parties regarding the matter, entertained argument of counsel and reviewed the two newspaper articles. In view of the facts presented to the court, the procedure followed by the court fully satisfied the requirement of a preliminary hearing. See *State* v. *Brown*, supra, 235 Conn. 526.

ing possible juror misconduct following the dismissal of one of the jurors. We also reject this claim.

Certain additional facts and procedural history are relevant to this claim. On September 8, 2000, after the trial had commenced, the court informed counsel, outside the presence of the jury, that one of the jurors had made a comment to a judicial marshal. Specifically, the court advised counsel that the juror had inquired as to whether the defendant was related to the chief of police of the Cheshire police department, and that, if so, the juror had a "real problem with that." The court further noted that the juror also had made some "off-color" remarks. In addition, the state's attorney informed the court that he personally had overheard some of those remarks while present in the courtroom. In light of the juror's statements, the trial court informed counsel that it was going to excuse the juror. Both the state's attorney and defense counsel stated that they had no objections to the court's decision, and the court thereafter excused the juror. On appeal, the defendant contends that the trial court, sua sponte, should have polled the jury, upon excusal of that juror, to ascertain whether any of the other jurors had heard the excused juror's comments, and, if so, whether those comments had prejudiced any juror against the defendant.[48]

Applying the relevant factors to the defendant's claim, we conclude that the trial court did not abuse its discretion in failing to poll the jury on the basis of

[48] We note that the defendant did not request that the trial court poll the jury with respect to the effect of the comments of the excused juror on the other jurors. Nevertheless, a trial court is obligated to undertake a preliminary inquiry anytime that it is presented with information indicating a reasonable possibility of juror misconduct or impropriety. E.g., *State* v. *Mukhtaar*, supra, 253 Conn. 296; *State* v. *Brown*, supra, 235 Conn. 526. Accordingly, the defendant is not precluded from raising his claim on appeal. The defendant's failure to make such a request when the juror was excused, however, suggests that, at the time of trial, he did not believe that polling the jury was necessary under the circumstances.

the comments of the excused juror. First, the private interest at stake, namely, the defendant's right to an impartial jury, contemplates that the trial court will consider the defendant's requests as they relate to the possible misconduct. See *State* v. *Mukhtaar*, supra, 253 Conn. 295. In the present case, defense counsel, after being fully apprised of the juror's statements, agreed with the trial court that dismissal of the juror was the proper remedy and sought nothing more.

The second relevant factor, namely, the risk of deprivation of a defendant's constitutional right to a trial before an impartial jury, depends in large measure on the "seriousness and . . . credibility of the allegations of jur[or] misconduct." Id., 296. In the present case, there is no basis for concluding that the statements at issue were prejudicial to the defendant. With respect to the juror's comment about the chief of police of the Cheshire police department, there is nothing in the record to suggest that the defendant is, in fact, related to that person. Indeed, it is unclear whether the excused juror would have treated the defendant favorably or unfavorably in light of the existence of such a relationship. Moreover, the trial court expressly noted that the comment was made to a judicial marshal only, and the record is devoid of any indication that the excused juror conveyed that remark to any of the other jurors. Finally, on at least two separate occasions before the juror was excused, the trial court had instructed the jurors not to speak with each other regarding the case. We must presume that the jurors followed the court's instructions in the absence of any evidence to the contrary. E.g., *State* v. *Copas*, supra, 252 Conn. 331. Thus, there is no evidence to suggest that the defendant suffered any prejudice by virtue of the excused juror's comments or "off-color" remarks. The record simply contains no indication that those statements were directed at the defendant or otherwise were prejudicial to him.

Finally, with respect to the final factor, namely, the state's interests in juror impartiality, protecting jurors' privacy or maintaining public confidence in the jury system; see *State* v. *Mukhtaar*, supra, 253 Conn. 296; we see no reason to conclude that these considerations obligated the court to poll the jury on the basis of the excused juror's comments. In view of the highly speculative nature of the defendant's claim and the absence of any demonstrable prejudice, the aforementioned considerations provide no appreciable support for the defendant's claim. For the foregoing reasons, we are persuaded that the trial court did not abuse its discretion in dismissing the juror without taking any additional remedial action.[49]

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and BORDEN and VERTEFEUILLE, Js., concurred.

---

KATZ, J., dissenting. In the present case, the majority concludes that, although the testimony of the defendant's biological daughter regarding the defendant's alleged sexual misconduct against her improperly was admitted under the identity exception to the rule prohibiting the admission of prior misconduct evidence, the testimony properly was admitted under the common scheme exception because, in both the incident involving the defendant's daughter and the incident involving the victim in the present case, the defendant allegedly had: (1) sexually abused a young girl (victim); (2) maintained a close relationship with the victim's mother,

---

[49] We note, however, that, for example, the trial court reasonably might have queried the excused juror to determine whether he had spoken to any of the other members of the jury about the case in violation of the trial court's instructions. Although we do not suggest that such an inquiry was necessary in the present case, we encourage trial courts to consider this approach when confronted with circumstances such as those presented in this case.

but was not married to her; (3) had access to the victim because of his relationship with her; (4) had ample opportunity to be alone with the victim; and (5) committed the assault on the victim by digital or penile penetration. The majority reasons that the prior misconduct evidence properly was admitted under the common plan or scheme exception because, although not *so* similar as to constitute a "signature"; see *State* v. *Figueroa*, 235 Conn. 145, 163, 665 A.2d 63 (1995); there are similarities between the offenses and the victims and the prior offense was not too remote in time to the charged offense. I reject this rationale because it reflects a further departure from the well established criteria for invoking the common scheme exception to which this court, until recently, has adhered. See C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.19.9. Sexual assault is a brutal and emotionally damaging crime, especially when the victim is a minor. This fact does not, however, justify the adoption of special rules of evidence or the relaxation of well established standards in derogation of a defendant's rights whenever the state seeks to introduce evidence of prior sexual misconduct.[1] Therefore, I would conclude that, applying our well established criteria, which I set forth herein, the trial court in the present case improperly admitted the testimony of the defendant's daughter under the common scheme or plan exception. I would further conclude that the admission of this evidence was not harmless. Accordingly, I would reverse the judgment.

In *State* v. *Esposito*, 192 Conn. 166, 172, 471 A.2d 949 (1984), this court discussed, in detail, the requirements for the common scheme exception to the general rule

---

[1] Indeed, I would suggest that creating exceptions to sound rules well ensconced in our jurisprudence based on the nature of the offense in question is reminiscent of other creatures of our common law that we have abandoned or abridged. See, e.g., *State* v. *Troupe*, 237 Conn. 284, 303, 677 A.2d 917 (1996) (scope of constancy of accusation held broader than necessary and limited accordingly).

prohibiting prior misconduct evidence: "When evidence of other offenses is offered to show a common plan or design the marks which the uncharged and the charged offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other. . . . It is apparent that the indicated inference does not arise, however, from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and [the] defendant's prior offenses, but also by numerous other crimes committed by persons other than [the] defendant." (Citation omitted; internal quotation marks omitted.)

Additionally, even when the alleged conduct perpetrated against one victim was more similar and therefore shared more in "common" with the alleged conduct for which the defendant has been charged, the evidence also must be probative that these acts were connected as part of an overall plan. See *State* v. *Shindell*, 195 Conn. 128, 135, 486 A.2d 637 (1985) ("evidence of other arsons, vandalism and false insurance claims [properly] admitted as probative of a common scheme to defraud insurance companies . . . that included the intentional destruction of property, by arson or vandalism, for profit, and the pressing of false claims for vandalism, theft and lost rents"); see also *State* v. *Murrell*, 7 Conn. App. 75, 90, 507 A.2d 1033 (1986) (noting absence of evidence, which, in combination with uncharged misconduct evidence, would "create the inference that these incidents were, in fact, parts of an overall plan, scheme or design"). The misconduct evidence can "only be connected to the charged crimes by showing a high degree of similarity in the modus operandi of their commission." *State* v. *Shindell*, supra, 135. As part of a continuing system of criminal activity, by design, there

will be a substantial number of factors that serve to connect the offense for which the defendant is on trial and the misconduct evidence the state seeks to introduce. Id. Thus, to be admissible, the uncharged act of misconduct must be "so intertwined with the crime charged as to indicate that they are separate components of a general plan." *United States* v. *Dothard*, 666 F.2d 498, 504 (11th Cir. 1982); see also *State* v. *Conroy*, 194 Conn. 623, 626, 484 A.2d 448 (1984) ("It is well settled that evidence of similar but unconnected crimes is generally not admissible to prove a criminal defendant's guilt. Such evidence can show no more than the defendant's bad character or an abstract disposition to commit a crime; it provides no proof of guilt of the specific offense in question.").

In the recent past, however, this court, specifically in the context of sexual assault cases, has relaxed the requirements of the common scheme exception to the point that, as the majority's opinion in the present case essentially concedes, the exception has swallowed the rule precluding the admission of such misconduct evidence. In *State* v. *Kulmac*, 230 Conn. 43, 80, 644 A.2d 887 (1994), I dissented, expressing my concerns in this regard. Much of what I stated therein has equal application to the present case and bears repeating. I noted therein that Professor Edward Imwinkelried of the University of California at Davis, who, in his treatise on this issue, divides the case law that has developed under the common plan exception into two categories: "true plan" cases, which he finds consistent with the prescribed exception; and "spurious plan" cases, which he rejects. Id., 82 (*Katz, J.*, dissenting). In his most recent treatise, Imwinkelried explains that, "[i]n a true plan case, the courts hold that the prosecutor may prove any uncharged crime by the defendant which shows that the defendant in fact and in mind formed a plan including the charged and uncharged crimes as stages

in the plan's execution. . . . [B]oth crimes must be inspired by the same impulse or purpose. Both crimes must be steps toward the accomplishment of the same final goal. They are different stages of the plan. It is not enough for the prosecution to show that the defendant had a plan including crimes similar to the charged crime; the prosecution must show that the plan included the specific crime the defendant is now charged with." 1 E. Imwinkelried, Uncharged Misconduct Evidence (Rev. Ed. 1999) § 3:22, pp. 117–19. Moreover, mere similarity between the crimes, standing alone, does not establish the existence of a true plan under another authoritative treatise. There must be a permissive inference that both crimes were related to an overall scheme in the defendant's mind. See 1 C. McCormick, Evidence (4th Ed. 1992) § 190, pp. 800–801 (to fall within common plan exception, "[e]ach crime should be an integral part of an over-arching plan explicitly conceived and executed by the defendant").

Imwinkelried is critical, however, of spurious plan cases, in which "[the] courts are quite liberal in admitting uncharged misconduct . . . . If the proponent can show a series of similar acts, these courts admit the evidence on the theory that a pattern or systematic course of conduct is sufficient to establish a plan. Similarity or likeness between the crimes suffices. In effect, these courts convert the doctrine into a plan-to-commit-a-series-of-similar-crimes theory. . . . In reality, these courts are arguably permitting the proponent to introduce propensity evidence in violation of the prohibition [against the admission of misconduct evidence]. Proof of a number of similar [crimes] may be probative of the defendant's status as a professional criminal . . . . However, if . . . there is no inference of a true plan in the defendant's mind, the proponent is offering the evidence on a forbidden theory of logical relevance. It is immaterial that there are many instances of similar

acts by the defendant; the large number of the acts increases the acts' probative value on the issue of the defendant's propensity, but standing alone the number of acts and similarities cannot change the propensity quality of the probative value. . . . The courts are illicitly allowing the proponent to prove the defendant's character, disposition, or propensity." 1 E. Imwinkelried, supra, § 3:24, pp. 128–29.

As I noted in my dissent in *Kulmac*, "appellate courts have relied on Professor Imwinkelried's cogent analysis to reverse trial court decisions admitting prior misconduct evidence in sexual assault cases. *Ali* v. *United States*, 520 A.2d 306 (D.C. 1987), is precisely on point. In *Ali*, the victim claimed that the defendant, who had been her mother's boyfriend, had molested her over a two year period starting when she was thirteen. The victim testified that the defendant had touched her breasts, and had engaged in vaginal and anal intercourse with her. Id., 308. Over the defendant's objection, the trial court allowed the government to introduce evidence under the common scheme or plan exception that on a few occasions, the defendant had touched the breasts of the victim's younger sister. Id., 309. The defendant was convicted.

"On appeal, the District of Columbia Court of Appeals held that the introduction of the evidence concerning the sister was reversible error, because that evidence 'is relevant to charges that [the] appellant engaged in sexual intercourse and sodomy with an entirely different individual on separate occasions only by means of one inference: because [the] appellant did so with [the sister], he did so with [the victim]. That is precisely the 'propensity' inference forbidden by [the rule against admitting uncharged misconduct evidence].' Id., 311. The court agreed with Professor Imwinkelried that '[t]he distinguishing characteristic of the common scheme or plan exception to inadmissibility is the exis-

tence of a true plan in the defendant's mind which includes the charged and uncharged crimes as stages in the plan's execution: the series of crimes must be mutually dependent.' Id., 312; see also *Government of the Virgin Islands* v. *Pinney*, 967 F.2d 912, 916 (3d Cir. 1992) (evidence of uncharged sexual misconduct inadmissible under common plan exception, because 'the government has been unable to articulate any theory that united these isolated events which occurred six years apart, without resorting to the kind of character-based inference prohibited by [the rule against admitting uncharged misconduct evidence]'); *People* v. *Engelman*, 434 Mich. 204, 221, 453 N.W.2d 656 (1990) (trial court erred in admitting evidence of uncharged sexual misconduct because the defendant 'did not have a single plan which encompassed both of these acts, and it does not appear on this record that the acts were in different stages of the same, comprehensive plan'); *State* v. *Eubank*, 60 Ohio St. 2d 183, 186, 398 N.E.2d 567 (1979) (trial court erred in admitting evidence of uncharged sexual misconduct under the common plan exception because the uncharged acts were not 'inextricably related' to the charged crime, but instead were 'chronologically and factually separate occurrences')." *State* v. *Kulmac*, supra, 230 Conn. 83–85 (*Katz, J.*, dissenting); see also *Becker* v. *ARCO Chemical Co.*, 207 F.3d 176, 197 (3d Cir. 2000) ("evidence [in employment discrimination case pertaining to termination of plaintiff's coworker] not admissible as proof of [the defendant's] 'plan' based on these principles, inasmuch as there was no evidence presented that the two terminations were connected, mutually dependent, or part of any larger goal of [the defendant's]"); *Commonwealth* v. *English*, 993 S.W.2d 941, 945 (Ky. 1999) (recognizing that common scheme or plan requires evidence that "the charged offenses were part and parcel of a greater endeavor which included the prior acts of sexual misconduct").

In the case before us, the evidence does not prove a common plan or scheme. First, the similarities on which the majority relies "are of such common occurrence that they are shared not only by the charged crime and [the] defendant's prior [alleged offense], but also by numerous other crimes committed by persons other than [the] defendant." (Internal quotation marks omitted.) *State* v. *Esposito*, supra, 192 Conn. 172. Indeed, even when viewed together, these similarities are not in any way distinctive. Four of the five similarities—the ages of the victims,[2] the defendant's close relationship with the victims, their mothers or their families generally, his access to the victims—*because* of those relationships—and the opportunity to be alone with the victims—again, because of those relationships—are of such "common occurrence" that they generally apply to pedophiles. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) § 302.2, pp. 527–28. The fifth "similarity"—the types of sexual activities alleged by the victims—is not really a similarity at all. In the present case, both the victim and the defendant's daughter accused the defendant of digital or penile penetration. Again, these activities, regrettably, are common to pedophiles generally; see id.; and, therefore, do not create the necessary " 'distinctive combination' " of actions that forms the modus operandi of the crime. *State* v. *Figueroa*, supra, 235 Conn. 164. Indeed, the trial court here found only that the prior misconduct evidence was "sufficiently similar" to justify its admission based on certain generic factors that are common to a class of sexual offenses. Cf. *State* v. *Murrell*, supra, 7 Conn. App. 81 ("law requires not only a high degree

---

[2] Nor are the ages of the victims of the charged and the uncharged offenses in the present case—three and nine years old—so similar as to be unique. See *State* v. *Murrell*, supra, 7 Conn. App. 81; cf. *State* v. *Kulmac*, supra, 230 Conn. 62–63 (similarity when three girls ranging in age from nine to eleven years old alleged misconduct by defendant).

of similarity between the events and circumstances of the past and present incidents, it imposes the additional requirement that those common features be 'sufficiently unique' . . . to warrant the desired inference" [citation omitted]).

Moreover, there is absolutely no evidence that there existed "a true plan in the defendant's mind"; *Ali* v. *United States*, supra, 520 A.2d 312; that included the alleged assaults on his daughter and the victim as stages in its execution. Indeed, the majority does not claim that the charged and uncharged acts of misconduct in this case were connected by a true plan in the defendant's mind. "[T]he only connection they claim between the charged and uncharged acts is the defendant's desire to sexually abuse young girls. Such a desire does not amount to a plan: 'Characterizing a plan in terms of a general bad motive may be probative of an accused's *status* as a bad person, but if there is no inference of a specific plan in the accused's mind which interconnects the uncharged and charged acts, then the other crimes evidence is offered for nothing other than the accused's propensity to commit a series of similar but discrete bad acts.' . . . [Id., 311]; see also *United States* v. *Brown*, 880 F.2d 1012, 1015 (9th Cir. 1989) (to be admissible, a prior act of misconduct 'must establish a motive to commit the crime charged, not simply a propensity to engage in criminal activity')." (Emphasis in original.) *State* v. *Kulmac*, supra, 230 Conn. 86 (*Katz, J.*, dissenting). By failing to apply the second prong of the common plan or scheme exception, the majority permits the admission of minimally similar evidence through the back door of that exception when it would not be permitted through the front door of the identity exception. I would conclude, therefore, that the trial court improperly determined that the testimony of the defendant's daughter satisfied the common plan or scheme exception.

Because I would conclude that the trial court improperly determined that both the identity and common scheme exception applied, I next would reach the question of the harmfulness of the impropriety.[3] "The standard for determining whether a nonconstitutional error is harmless is [whether] . . . it is more probable than not that the erroneous action of the court affected the result."[4] (Internal quotation marks omitted.) *State* v. *Cavell*, 235 Conn. 711, 721–22, 670 A.2d 261 (1996). The burden to prove harmfulness is borne by the defendant. *State* v. *Pappas*, 256 Conn. 854, 892, 776 A.2d 1091 (2001).

It essentially is undisputed that the determinative issue at trial in the present case was the identity of the victim's assailant. The victim, although sixteen at the time of trial, was three years old when the abuse was discovered. Because she had no memory of the abuse, neither she, nor any other witness, could provide specific details of the alleged assault. In fact, the jury heard only from third party witnesses to whom the victim had made statements that, because of her tender years, lacked detail. By contrast, however, the defendant's daughter provided a precise account of what the defen-

---

[3] For the same reasons that I conclude herein that the trial court decision admitting the evidence was not harmless, I also would conclude that, whatever relevance the evidence may have had, its prejudicial effect far outweighed its probative value and, accordingly, that the trial court abused its discretion in admitting the evidence.

[4] In *State* v. *Meehan*, 260 Conn. 372, 397 n.13, 796 A.2d 1191 (2002), we recognized that this court previously had "noted, without resolving, that there appear to be two standards of review for establishing the existence of harmful error. One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Internal quotation marks omitted.) See *State* v. *Young*, 258 Conn. 79, 95, 779 A.2d 112 (2001). Because I would conclude that the evidence admitted in this case constitutes harmful error under either standard, I need not reach the question of the dual standards. See *State* v. *Meehan*, supra, 397 n.13.

688

dant allegedly had done to her. This evidence undoubtedly posed a serious risk that the jury would engraft those details onto the victim's general allegations, details which the victim herself had been unable to provide. Moreover, this evidence clearly would tend to lead the jury in the present case to conclude that the defendant had a distinct propensity to assault young girls and that, therefore, he must have been the person responsible for the victim's injuries. This result is exactly what the general rule barring misconduct evidence is designed to avoid. Under these circumstances, therefore, I would conclude that the defendant has established the requisite harmfulness to require reversal of the trial court's judgment.

Accordingly, I respectfully dissent.