DAVID KERVICK, EXECUTOR (ESTATE OF RUTH FARRELL) *v.* SILVER HILL HOSPITAL ET AL.
(AC 29783)

Gruendel, Harper and Pellegrino, Js.

Argued December 9, 2010—officially released May 3, 2011

*Sandra J. Akoury,* for the appellant (plaintiff).

*Catherine S. Nietzel,* for the appellee (defendant Silver Hill Hospital).

*David J. Robertson,* with whom, on the brief, were *Madonna A. Sacco* and *Rachel E. Katz,* for the appellee (defendant Ellyn Shander).

*Opinion*

GRUENDEL, J. The plaintiff, David Kervick, executor of the estate of Ruth Farrell (decedent), appeals from the judgment of the trial court rendered in favor of the defendants, Silver Hill Hospital (hospital) and Ellyn Shander, following a jury trial. The dispositive issues in this appeal are whether the court improperly (1) refused to poll the jury regarding possible exposure to pretrial publicity and (2) denied Kervick's motion for summary judgment as to the apportionment defendant,[1] David Kervick, in his individual capacity.[2] We reverse the judgment of the trial court.

The following facts and procedural history are relevant to the disposition of this appeal. On January 21, 2002, the decedent admitted herself to the hospital for treatment for numerous illnesses, including major depression and personality disorder. At the time of her

---

[1] Because these two issues are dispositive, we decline to address Kervick's remaining claims that the court improperly denied his motion to strike, improperly denied his motion to bifurcate the trial, improperly denied his motion to set aside the verdict, improperly denied his motion to impeach the verdict and that he was denied a fair trial by the improper conduct of counsel for Shander.

[2] The defendants filed apportionment complaints against David Kervick in his individual capacity. For convenience, we will refer to the apportionment plaintiffs as the defendants in this opinion. Prior to trial, Kervick moved for summary judgment as to the apportionment complaints, which the court denied as untimely. Kervick now appeals from this ruling.

admission, the decedent was diagnosed with extremely high suicide ideation and had previously attempted suicide by hanging herself over the bathroom door of her hospital room. As such, the admitting doctor ordered that the decedent's bathroom door remain locked. Nonetheless, the day after the decedent's admission, Shander, the decedent's treating psychiatrist, ordered that the bathroom door be unlocked and reduced supervision of the decedent from full time to fifteen minute intervals. On January 28, 2002, the decedent committed suicide by hanging herself over the unlocked bathroom door in the same hospital room in which she had previously attempted to do so.

On February 6, 2004, Kervick filed this medical malpractice action, claiming that the defendants had failed to meet the standard of care owed to the decedent as a patient of the hospital and that this failure resulted in the decedent's death.[3] In June, 2004, the defendants filed apportionment complaints against Kervick, alleging that his negligence, "abuse and hostile behavior" toward the decedent were the proximate causes of her suicide.[4] Subsequently, Kervick moved to preclude the defendants from presenting expert testimony as to the possible causal connection between his alleged behavior and the decedent's suicide. On November 14, 2007, the court granted Kervick's motion to preclude, finding that the defendants had failed to disclose their proffered experts in a timely manner. Then, on November 19, 2007, Kervick moved for summary judgment on the apportionment complaints arguing that, without expert testimony as to the possible causal link between his

[3] Several months before her suicide, the decedent executed a will naming Kervick executor of her estate. Kervick was also named as one of two beneficiaries of the decedent's will.

[4] Kervick became acquainted with the decedent during a prior stay at the hospital, and there is evidence that the two shared a romantic relationship for some time before the decedent's suicide.

alleged behavior and the decedent's suicide, the defendants would be unable to prevail in their apportionment claims against him. Thereafter, the court denied Kervick's motion for summary judgment as untimely without considering further the merits thereof.

On November 23, 2007, the Friday immediately following Thanksgiving, an extensive article (article) regarding the decedent's suicide was published in the New York Times. A. Cowan, "Lawsuit Over a Suicide at a Hospital for the Elite," N.Y. Times, November 23, 2007, p. B1. At the time the article was published, the jury had been impaneled, although evidence was not scheduled to begin until November 27, 2007. Given the inflammatory nature of the article, Kervick believed that any juror exposed to the article's contents would be unfairly prejudiced. Thus, immediately upon appearing in court on November 27, 2007, counsel for Kervick requested that the court poll the jury as to its exposure to the article to determine whether any of the jurors had been unduly influenced thereby. The court denied the request to poll the jury, concluding that it would "be more prudent simply to instruct them to ignore anything in the press or on the media." The jury then returned a verdict in favor of the defendants without considering the merits of the defendants' apportionment complaints. On February 25, 2008, the court denied Kervick's motions to set aside and to impeach the verdict, rendering judgment in favor of the defendants on November 5, 2008. This appeal followed.

Kervick now claims that the court improperly declined to poll the jury regarding its exposure to the article and the possible influence the article may have had on the jury's impartial decision making. Additionally, Kervick claims that the court improperly denied his motion for summary judgment as untimely. We address each of these claims in turn.

I

Kervick first claims that the court improperly denied his request to poll the jury as to its exposure to the article. Specifically, he maintains that the court's refusal to poll the jury constituted an abuse of discretion, especially in light of the inflammatory nature of the article and the potential prejudice and undue influence that exposure would have on the jury.[5] We agree.

The following additional facts are relevant to the resolution of this claim. Counsel for Kervick first notified the court of the article on November 27, 2007, the day that evidence was scheduled to begin before the jury. It bears repeating that the jury had been impaneled at the time the article was published, although it is undisputed that a judge had not previously instructed the jury to avoid media coverage of the case.[6] After Kervick's counsel requested that the jury be polled, the following colloquy ensued:

"The Court: I saw the article that appeared in the New York Times on Friday, the Friday after Thanksgiving, which I would expect for a lot of working people who get the Times at their office or read it on the train or whatever, would have been a day when they maybe failed to pick it up, because while it's not a holiday, nevertheless, it's a, was a day when a lot of business activities closed. The stock market was only opened for half a day. . . . [The article] seemed to be, it didn't seem to be pro plaintiff or pro defendant. . . . There were some factual matters in there. Rather than asking

---

[5] Although we decline to reiterate the contents of the article here, we note that counsel for the hospital conceded during oral argument in this appeal that a juror who read the article would be tainted by such exposure.

[6] Although counsel for the hospital represented during oral argument in this appeal that the jury members had been informed by a clerk to avoid media coverage of the case prior to trial, we do not equate an instruction by a clerk with that by a judge. Furthermore, the record before us contains no evidence of such an instruction.

the jury and calling their attention to the [article] . . . wouldn't it be more prudent simply to instruct them to ignore anything in the press or on the media? . . .

"[Kervick's Counsel]: I would like to have the court find out if anyone has read it. Because I don't know how people interpret what they read. I don't know if it was influential or not. . . .

"The Court: Well, I expect that if it comes to their attention that somebody has read it, then we'll be hearing about it.

"[Kervick's Counsel]: Well, how are we going to hear about it, unless we ask?

\* \* \*

"The Court: Now, look, if you have an agreement and you came to me and you said: 'We've agreed upon this procedure. This is what we want to do with respect to the article.' Then I might be wiling to listen. But the jurors are here. We're ready to hear evidence. If you don't have a plan, we're not [putting] one together at the last moment. . . .

"[Kervick's Counsel]: Judge . . . I don't think we need agreement of counsel on—

"The Court: Well, you haven't convinced me that in light of the nature of the article, there's any need to make an inquiry."

The court then declined to inquire further into whether the jury had read or otherwise been exposed to the article. Kervick now claims that the court's reasoning in denying the request to poll the jury demonstrates an abuse of discretion given the possible prejudice the article may have exacted on the jury. In support of his claim, Kervick argues that, without inquiring into whether any jurors read the article, there

was no way of determining whether the jury had been unduly influenced before the start of trial.

Before addressing the merits of Kervick's claim, we begin by setting forth the applicable standard of review and legal principles governing our analysis. Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right of a trial by jury shall remain inviolate . . . ." Of course, the right to a jury trial would be a mere nullity were it not for the guarantee of jury impartiality. As our Supreme Court has noted, "[j]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut . . . . [This is because] [t]he modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment [we previously have held, pursuant to our supervisory authority over the administration of justice, that] a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . .

"The form and scope [of that preliminary inquiry] may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jur[or] [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have [a] limited . . . role, on appeal, to a consideration of whether the trial court's review of alleged jur[or] misconduct [or bias] can fairly be characterized as an abuse of its discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 672–73, 835 A.2d 895 (2003).

In *Merriam*, our Supreme Court addressed the issue of pretrial publicity and its effect on jury impartiality in the criminal context. In *Merriam*, "the defendant informed the court that two newspaper articles regarding the case had been published . . . . The defendant characterized these articles as . . . rather disturbing . . . [and moved] that the trial court poll the jury to see if they [had] read anything in any . . . newspaper . . . and just warn them not to. *The defendant, however, made no request that the court make any specific inquiry into whether any juror or jurors had read either of the two articles* . . . .

"The trial court denied the defendant's request, noting that the jurors *previously had been instructed to avoid media coverage of the case and that there was no indication that jurors had disregarded those instructions.* The court further observed that the two articles identified by the defendant were brief and not notorious . . . [and] that, during the voir dire of prospective jurors, counsel had inquired of those prospective jurors whether they had had any exposure to the

case, [to which] each such venireperson had answered in the negative." (Emphasis added; internal quotation marks omitted.) Id., 674. Finally, in upholding the trial court's decision not to poll the jury, our Supreme Court rejected the defendant's contention that the mere existence of the articles required the court to poll the jury *"in light of the fact that the court previously had instructed the jurors . . . to avoid exposure to any media accounts of the case."* (Emphasis added.) Id., 675.

Here, none of the safeguards of jury impartiality identified in *Merriam* are present. Importantly, at no time prior to publication of the article were the jurors in this case instructed by a judge to avoid media coverage of the ensuing trial. Cf. *State* v. *Marshall*, 166 Conn. 593, 598, 353 A.2d 756 (1974) (holding that trial court did not abuse discretion in failing to poll jury where instructions to avoid media coverage given before publication of newspaper article). Additionally, neither party's counsel had the opportunity to question prospective jurors as to their exposure to the article, as the article had not yet been published at the time of voir dire. Unlike in *Merriam*, the article here is extensive, factually detailed and so overtly inflammatory that it is difficult to conceive how a juror would remain impartial if exposed to its contents.[7] Moreover, Kervick, the plaintiff in the present case, unlike the defendant in *Merriam*, requested that the court make the specific inquiry into whether any juror or jurors had read the article. See *State* v. *Merriam*, supra, 264 Conn. 674. Indeed, we fail to see how the possibility of jury partiality could be addressed without inquiring into whether the jury members had even become aware of the article itself.

Given these circumstances, we conclude that the court was obligated to conduct a preliminary inquiry

[7] As but one example, the article stated that the decedent "told the hospital's medical staff how [Kervick] used drugs in her presence . . . and tied her to a bed and forced her to watch pornography." A. Cowan, supra, p. B5.

to evaluate the extent, if any, of juror bias as caused by exposure to the article. We further conclude that any cursory questioning of Kervick's counsel on November 27, 2007, was insufficient to dispel the possibility of juror bias pursuant to *Merriam.* As the colloquy between the court and Kervick's counsel indicates, the court failed to undertake the preliminary inquiry that *Merriam* necessitates, concluding instead that it would "be more prudent simply to instruct [the jurors] to ignore anything in the press or on the media" regarding the case. Of course, by the time the court made this ruling, the article had been published, and the possibility that it had already prejudiced jury members could not be cured with a prophylactic instruction. The fact that the court declined to consider fully the request of Kervick's counsel to poll the jury in the absence of the parties' agreement in this regard is also improper. Where, as here, the possibility of jury bias is adequately presented to the court, it is the obligation of the court, not the parties, to determine the appropriate procedures to be employed to ensure the jury is impartial. See *State* v. *Merriam,* supra, 264 Conn. 672. This in turn ensures that the constitutional guarantee of an impartial jury is faithfully adhered to. See Conn. Const., art. I, § 19.

In sum, the existence of the inflammatory article, coupled with the fact that the jury had not previously been instructed by a judge to avoid media coverage, was sufficient "information . . . to indicate the possibility of juror . . . partiality"; *State* v. *Merriam,* supra, 264 Conn. 672; and, as such, the court was required to conduct a preliminary inquiry to this effect pursuant to *Merriam;* id.; that it did not do. Accordingly, the court's ruling denying the request by Kervick's counsel to poll the jury as to its exposure to the article constituted an abuse of discretion and, at a minimum, jeopardized Kervick's constitutional right to an impartial jury. Therefore, the judgment of the trial court is reversed,

and the case is remanded for a new trial according to law.

## II

Kervick next claims that the court improperly denied his motion for summary judgment on the apportionment complaints against him in his individual capacity. Specifically, he claims that the court's denial of his motion for summary judgment as untimely constitutes an abuse of discretion. We disagree, yet in light of our ruling in part I of this opinion remanding the case for a new trial, we conclude that the court must consider the merits of Kervick's motion upon remand.

The following additional facts are relevant to the resolution of this claim. The central theory on which the apportionment complaints are predicated is Kervick's negligence, as manifested by his allegedly abusive behavior toward the decedent. As such, the defendants were obligated to prove the elements of their negligence cause of action, including causation. In October, 2007, the defendants filed disclosures of expert witnesses in preparation for offering expert testimony as to the causal link between Kervick's behavior and the decedent's suicide. Kervick then filed motions to preclude the proffered expert testimony, claiming, inter alia, that the defendants' disclosures were untimely. On November 14, 2007, the court granted Kervick's motions to preclude. On November 19, 2007, Kervick moved for summary judgment on the apportionment complaints, arguing that, without expert testimony as to the causal link between his alleged negligence and the decedent's suicide, the defendants could not prevail on their negligence claims. The court did not hold a hearing on Kervick's motion for summary judgment, and the matter was only briefly addressed before the court on November 27, 2007. At that time the following colloquy took place:

"The Court: [Y]ou were looking for summary judgment on the apportionment complaint as I recall?

"[Kervick's Counsel]: Yes, Your Honor.

"The Court: The problem with that is there wasn't time to put the [defendants] on notice as to the fact that, that's exactly what you were trying to accomplish and so we were in no position to handle that.

"[Kervick's Counsel]: Okay.

"[The Court]: So that's why that was denied, not on the merits, just because of a timing issue."

Kervick now claims that the court's ruling summarily denying the motion for summary judgment as untimely was improper, especially given the fact that the motion was filed within five days of the court's ruling granting the motion to preclude the expert testimony offered by the defendants.

Because the court denied Kervick's motion for summary judgment, not on the merits but, rather, as untimely, we review the court's ruling for an abuse of discretion. See *Singhaviroj* v. *Board of Education*, 124 Conn. App. 228, 235, 4 A.3d 851 (2010). "In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 392–93, 3 A.3d 892 (2010).

"Practice Book § 17-44 provides in relevant part that [t]he pendency of a motion for summary judgment shall delay trial only at the discretion of the trial judge. In matters vested to the discretion of the court, our appellate courts must make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Singhaviroj* v. *Board of Education*, supra, 124 Conn. App. 234–35.

In the present case, the court summarily denied Kervick's motion for summary judgment as untimely, concluding on November 27, 2007, that it was "[j]ust too late, just too late for that." Although we acknowledge that Kervick's motion for summary judgment was filed within five days of the court's ruling granting his motion to preclude the expert testimony proffered by the defendants, we cannot say that the court's ruling denying the motion for summary judgment as untimely constituted an abuse of discretion in this case. It is undisputed that the motion for summary judgment was filed on the eve of trial and was first addressed by the court on the same day evidence was scheduled to begin. Thus, in light of the ample discretion afforded a trial judge in determining whether a pending motion for summary judgment shall delay trial and the particular facts of this case, we cannot say that the court abused its discretion in refusing to decide the merits of Kervick's motion for summary judgment. See *Singhaviroj* v. *Board of Education*, supra, 124 Conn. App. 235.

Our analysis, however, does not end there. Because we conclude that a new trial is necessary in this case,[8] we further conclude that the court must consider the merits of Kervick's motion for summary judgment in the first instance on remand. This is appropriate considering the fact that the court's previous ruling denying Kervick's motion for summary judgment was based

[8] See part I of this opinion.

solely on "a timing issue," rather than the merits thereof. Because there will be no such "timing issue" on remand, the court will have an adequate opportunity to address the merits of Kervick's motion for summary judgment.

Accordingly, we conclude that the court did not abuse its discretion by denying Kervick's motion for summary judgment as untimely. Nonetheless, upon remand the court is to consider the merits of Kervick's motion, as there will be sufficient time to do so prior to the new trial.

The judgment is reversed and the case is remanded for consideration of the apportionment defendant's motion for summary judgment on the apportionment complaints and for a new trial.

In this opinion the other judges concurred.